MYRA CLARK GAINES, APPELLANT, *v.* DUNCAN N. HENNEN.

Since the case of Mrs. Gaines was before this court, as reported in 12 Howard, 537, the olographic will made by Daniel Clark, in 1813, was ordered by the Supreme Court of Louisiana to be admitted to probate, notwithstanding its loss.

The judgment of the Supreme Court of that State is coincident with the conclusions of this court upon the testimony which related to the execution by Mr. Clark of his olographic will of 1813, and of the concealment or destruction of it after his death.

This will declared Mrs. Gaines to be his legitimate and only daughter, and universal legatee.

In the bill filed by Mrs. Gaines to recover the property sold by the executors appointed by a former will of 1811, it was not necessary to make these executors parties. The reasons stated.

It was not necessary formally to set aside the will of 1811 before proceeding under that of 1813. Any one who desired to contest this latter will in a direct action was not concluded from doing so.

The title of Mrs. Gaines is not barred by prescription, as defined by the law of Louisiana. The reasons explained.

The decision of this court in 12 Howard, 473, did not overrule the decision in 6 Howard, 550. The two cases explained.

The case in 12 Howard cannot be set up as a defence in the present case as

being *res judicata.* They are dissimilar as to parties and things sued for, or what is called the object of the judgment.

The paper misnamed the ecclesiastical record, purporting to be an acquittal of Des Grange of bigamy, is not admissible evidence in this case. But if it was so, it would neither of itself, nor in connection with all that is evidence in the record, serve to prove the adulterous bastardy of the complainant, as the rule of evidence requires that to be done, in opposition to the testamentary declaration of her father, in his own handwriting, that she was his legitimate and only daughter, and, as such, by him constituted his universal legatee.

The charge of adulterous bastardy, as made by the defendant, is not in response to the complainant's bill, but is an affirmative allegation of a fact by them, and the burthen of proof is upon them to establish it in contradiction to the declaration of her father, in his written will, that she was his legitimate child

The paper or record, as called, is not that of a legally-constituted tribunal, according to either the ecclesiastical usages or the laws of Spain, as they prevailed in Louisiana at any time when that province was a part of the dominion of Spain. And neither the Canon Hasset, the Alcalde Caisergues, nor the Notary Franco Bermudez, had either individual or conjoined authority to take cognizance of a charge of bigamy in the way it was done.

The difference explained between the case now before the court and that which was heretofore presented. If it had been proved, which it never was, that Mrs. Gaines was the offspring of an illicit intercourse, still she could take as universal legatee, from her father's testamentary declaration of her legitimacy.

The code of Louisiana makes a distinction between acknowledged natural children and adulterine children; allowing the former to take as legatees, but not allowing the latter to do so, except to a small amount.

But the legal relations of adulterous bastardy do not arise in this case. The law examined relative to putative marriages, which are where, in cases of bigamy, both parents, or either of them, contracted the second marriage in good faith. The issue of such a marriage is legitimate.

The Louisiana cases, the Spanish law, and the Code Napoleon, examined as bearing upon this point, and the principles established by them applied to the present case.

Clark, the father, was capable of contracting marriage; the consequence examined of his testamentary recognition of his child's legitimacy.

The evidence examined which is supposed to sustain the position that the connection between Clark and Zulime Carriere was adulterous, so as to bar the offspring from taking as a legatee under her father's will. The evidence declared to be sufficient in a civil suit to establish the fact that Des Grange committed bigamy when he married Zulime.

The difference explained between the evidence which is sufficient to establish the charge of bigamy in a civil suit and that necessary to establish it in a criminal prosecution.

The evidence of Coxe and Bellechasse examined, and also that relating to the parentage of Caroline Barnes.

*Gaines v. Hennen.*

The effect examined of the record from the County Court of New Orleans, in which Zulime prayed for a divorce from Des Grange; and also of the testimony to prove her marriage with Clark.

Whether she married in good faith or not, the weight of testimony is that Clark did so; and therefore Mrs. Gaines is entitled to inherit her father's estate under the olographic will of 1813.

THIS was an appeal from the Circuit Court of the United States for the eastern district of Louisiana.

The case had been frequently before this court in various aspects; first, in 13 Peters, 404, then in 15 Peters, 9, 2 Howard, 619, 6 Howard, 552, 15 Howard, 473. In some of these reports large extracts are made from the record, illustrating the points of law and fact then under consideration, and also the evidence in support of them. All of this past history was brought again to the notice of the court in the argument of the present case, which cannot be again recited in the present report. The reader who wishes to understand all the points which are discussed in the opinion of the court must turn back to the preceding volumes above cited, and follow the case through its successive developments. He will then be able to appreciate the concluding remark in the opinion of the court, which is as follows:

"When hereafter some distinguished American lawyer shall retire from his practice to write the history of his country's jurisprudence, this case will be registered by him as the most remarkable in the records of its courts."

It was argued by *Mr. Cushing* and *Mr. Perin* for the appellant, and *Mr. Janin* and *Mr. Hennen* for the appellee.

The record in this case consisted of a thousand printed pages, and the records in the preceding cases were introduced, also, into this. The reporter is saved from the almost hopeless task of following the counsel through this wide range of inquiry by the minute examination of the points of the case contained in the opinion of the court and dissenting opinion of Mr. Justice CATRON.

Mr. Justice WAYNE delivered the opinion of the court.

We will first give some of the facts of this case, that the litigation which has grown out of the wills of Daniel Clark may be correctly understood. Without them it could not be.

They have been the subject of five appeals to this court. This is the sixth. It presents the controversy differently from what it has been before. It also presents points for decision which were not raised in either of the preceding cases. Some of those that were, however, will necessarily be mentioned in this opinion to illustrate their connection with this case. They may be so considered without our coming at all into conflict with any judgment heretofore given concerning the rights of the parties in any antecedent appeal. Our conclusion will differ from one of them on account of testimony in this case which was not in that, but they will not be contradictory; and because we have information in this, concerning a piece of testimony then relied upon, which we shall exclude in this, as inadmissible for any purpose.

Four of the five appeals were decided by this court substantially in favor of Mrs. Gaines. The fifth was adverse, not in anywise excluding the re-examination of the only point then ruled by the use of the same testimony, and that which is new. Considered in connection, both have impressed us with a different impression of the status of Mrs. Gaines's legitimacy from that which this court did not then think was sufficiently proved, as we now think it has been. Now she is here with a support which her cases have not had before. She comes with a decision of the Supreme Court of Louisiana, directing, upon her application, that the will of Daniel Clark, dated at New Orleans, July 13, 1813, as set forth in her petition, should be recognised as his last will and testament, and that it should be recorded and executed as such. In that will her father acknowledges that his beloved Myra, then living in the family of Samuel B. Davis, is his legitimate and only daughter, and bequeaths to her all the estate, real and personal, of which he might die possessed, subject only to the payment of certain legacies named in the will.

Her petition for the probate of that will was first addressed

to the second district court of New Orleans, in which Judge J. N. Lea presided.

After asserting that such a will had been made by her father, its contents were set out as they were recollected by witnesses who had read it, and by other persons to whom it had been shown by the testator, with whom he spoke of it in the last moments of his life, as his last will and testament, in favor of his legitimate daughter, Myra, charging them to take care of it, and telling them it would be found locked up in a trunk, describing it, which he had placed in a certain room in his house.

The will is then stated in the petition to have been olographic; that is, altogether written and signed in her father's handwriting, with his seal attached to the same; that immediately after his death diligent searches were made for it; that it could not then be found; that it has not been since, and that it had been mislaid, lost, or destroyed.

She then declares, that when her father died she was a minor, absent from New Orleans, and living with Samuel B. Davis, to whom and whose lady she had been confided in the year 1812. Judge Lea took cognizance of her petition, proceeded throughout its pendency with great judicial exactness and caution, and, as the whole record shows, with official liberality to every one concerned in resisting the application, without in any particular having denied to the petitioner her rights.

The Judge, however, finally decided against the sufficiency of the proof to establish the will according to the requirements of the Civil Code of Louisiana, but without prejudice to the right of the petitioner to renew her application, with such proofs as might be sufficient to establish an olographic will. She applied for a new trial, and upon that being denied, solicited an appeal to the Supreme Court, and that was allowed.

The Supreme Court tried the case. It differed with Judge Lea as to the proof which was required by the Code to establish a lost or destroyed olographic will. It reversed the judgment of the court below, and decreed that the will of Daniel

Clark, dated on the 13th July, 1813, should be recognised as his last will and testament, and ordered it to be recorded and to be executed as such, it being posterior to the will of May, 1811, which Relf and Chew had presented for probate, under which they had taken possession of the property of Daniel Clark, and had disposed of it to the entire exclusion of Mrs. Gaines from any part of it—an estate shown by the proof in the cause introduced by the defendants, which had been registered or inventoried a short time before Clark's death, at more than seven hundred thousand dollars, in which Clark and Coxe were interested, and an estate exclusively belonging to Clark of two hundred and ninety-six thousand dollars.

But to return to the decree of the Supreme Court establishing the will of 1813; it must be understood, that its admission of the will to probate does not exclude any one who may desire to contest the will with Mrs. Gaines from doing it in a direct proceeding, or from using any means of defence by way of answer or exception, whenever she shall use the probate as a muniment of title. And the probate does not conclude Relf and Chew, or any other parties having any interest to do so, to oppose the will, when it shall be set up against them, by such defences as the law will permit in like cases. It was with those qualifications of the probate of the will of 1813 that the case was tried in the court below, and they have been constantly in our minds in the trial of the appeal here.

Upon the rendition of the probate by the Supreme Court, Mrs. Gaines filed her bill in this case. It shall be fully stated hereafter, with the defences made against it.

Before doing so, it is due to the merits of the controversy to advert to the decisions of the probate court of the second district of New Orleans, and to that of the Supreme Court reversing it, more minutely than has been done. Especially, too, as they are coincident with our conclusions upon the testimony regarding the execution by Mr. Clark of his olographic will of 1813, and of the concealment or destruction of it after his death.

The Supreme Court adopts the prepared statement of the facts of the case as it was made by Judge Lea in the court

below. Its accuracy has never been denied by any one of the parties interested in this suit, nor by any one else.

It is as follows: "The petitioner alleges, that on the 16th of August, 1813, the late Daniel Clark, her father, departed this life, having previously, on the 13th of July, executed an olgraphic will and testament, by which he recognised her as his legitimate and only daughter, and constituted her universal legatee. That the will was wholly written, dated, and signed, in the handwriting of the testator, and was left among his papers at his residence; that after his death search had been made for it, but that it was not found, and that it had been mislaid, lost, or destroyed."

The learned Judge then proceeds: "To entitle the petitioner to a judgment recognising the existence and validity of the will, it is necessary that she should establish affirmatively, by such testimony as the law deems requisite, that Daniel Clark did execute a last will containing testamentary dispositions as set forth in the petition, and that he died without having destroyed or revoked it." "That looking for the testimony which might solve the question, whether such a will had ever been executed or not, a reasonable inquirer would naturally turn for information to those who were most intimate with the deceased in the latter part of his life, and especially, if they could be found, to those who were with him in the last moments of his existence, when the hand of death was upon him, if they had no interest in directing his property into any particular channel, as they might be considered as the best and most reliable witnesses that could be produced; *and it appears to be precisely testimony of that character that the petitioner presents in support of her application.*" Judge Lea then says: "Boisfontaine had business relations with the deceased which brought them into frequent intercourse; and that for the two last days of his life, up to the moment of his death, he was with him. That De la Croix and Bellechasse were intimate personal friends of Clark, and were with him shortly before his death. All of these witnesses concur in stating that Clark said he had made a will posterior to that of 1811, and De la Croix says, that Clark presented to him in his cabinet a sealed parcel,

which he declared to be his last will, and that it would be found in a small black trunk. De la Croix also had sworn, shortly after Relf had presented the will of 1811 for probate, that Clark had made a will posterior to that; that the existence of it was known to several persons, and he applied for an order of the court and obtained it, commanding every notary in New Orleans to report if such a document had not been deposited with one of them. Bellechasse and Mrs. Harper swore that they had read the will. The Judge then expresses his conclusion to be, *that the legal presumption of the existence of such a paper had been made out, and that its having been destroyed or revoked by the testator had been satisfactorily rebutted,* and that there was nothing in the record to impeach the credibility of Bellechasse or Mrs. Harper. In these rulings of the district judge the Supreme Court concurred, and then said, in delivering its opinion, all that they had to do was to inquire whether the will of 1813 had been proved in conformity with the article No. 169 of the old Code or 1648 of the new."

Those articles require the testimony of two witnesses when the will shall be presented for probate, who shall declare their recognition of it as having been written wholly by the testator, that it had been signed and sealed by him, and their declaration that they had often seen him write and sign in his lifetime. It was from such a requirement of proof, rejecting secondary testimony altogether, that the District Court refused the petition for a probate of the will. Upon such refusal, Mrs. Gaines appealed to the Supreme Court.

That court said: "That the question of the alleged insufficiency of the proof in the case could only be determined by an inquiry; whether the article was to be pursued *at all times and in all cases,* or whether they were not merely directions when the will itself was presented for probate, and were inapplicable to restrain the court in certain cases, when by reason of the loss or destruction of such an instrument, from taking secondary proof of its contents, as the best which the nature of the case was susceptible."

The court then, by a course of reasoning, supported by several cases from the Louisiana Reports, determined that in the

*Gaines v. Hennen.*

event of a will having been destroyed, secondary proof is admissible in Louisiana to prove its contents, and to carry it to probate; that the articles 169 and 1648 contemplate that the will itself should be presented, with the proofs of its execution, to the judge of probate, *when that can be done; that* no one would seriously contend that the calamity of its destruction should deprive the legatee of the right to establish it by secondary evidence; "for was such the law, a reward would be offered to villainy, and it would always be in the power of an unscrupulous heir to prevent the execution of a will." It then meets the assertion directly, that articles 1648 and 1649 of the *Code require the production of the will in order that it might be identified by witnesses who recognise it; denies that position,* and affirms that in the absence of such witnesses the evidence concerning an unproduced, destroyed olographic will might be complete. The articles are not negative laws, declaring that no other kind of proof shall be admitted. "And it is doubted very much if an olographic will made here had by some accident been destroyed before being legally proved, whether a copy of it, identified by two witnesses, who were able to swear to the genuineness of the original in the manner pointed out by law, would not be considered a sufficient compliance with the provisions of the Code." Such, in fact, was the petitioner's case they were considering. Such is the law in analogous cases. The law cannot have been intended to require an impossibility, and to leave a party so circumstanced without a remedy.

The doctrine of the common law is in accordance with the view taken by the Supreme Court of Louisiana concerning lost deeds and wills. It has been judicially acted upon in English and American cases. It was so in the case of Dove *v.* Brown, 4 Carver, 469. That was a suit upon a lost will devising real estate. By the statute of New York it was necessary to prove the will by three credible witnesses. The will of Brown, as to its execution, was proved by one of the subscribing witnesses. He stated it was executed in the presence of himself, James Mallory, and another person whose name he did not remember, but that he had no doubt of his being a

credible witness. That, the court said, was all the evidence which could be expected under the circumstances. There are several other cases to the same effect in our American Reports. Jarman, on the Probate of Wills, 1 vol., Perkins's edition, p. 223, says, upon the authority of many cases, note 4: "That if a will, duly executed and not revoked, is lost, destroyed, or mislaid, either in the lifetime of the testator, without his knowledge, or after his death, it may be admitted to probate upon satisfactory proof being given of its having been so lost, destroyed, or mislaid, and also of its contents." But to entitle a party to give parol evidence of a will alleged to be destroyed, where there is not conclusive evidence of its absolute destruction, the party must show that he has made diligent search and inquiry after the will in those places where it would most probably be found, if in existence. Under its reasoning, the Supreme Court of Louisiana, sustained by the authorities in England and in the United States, admitted the olographic will of 1813 of Daniel Clark to probate, declaring also such was the law in Louisiana, and reversed the judgment of the lower court dismissing the petition of Mrs. Gaines.

In virtue of that decision of the Supreme Court, Mrs. Gaines presents herself to this court, declared by her father to be his legitimate and only daughter, and universal legatee. *We will in another part of this opinion show the legal effect of her father's testamentary declaration.*

We will now state, as briefly as it may be done in such a case, the essential allegations of the bill; the responses of the defendants and their averments; the proofs in support of the complainant's rights, and such of them as are relied upon to defeat them; the legal issues made by the bill and answers, and the points relied upon by both parties in their arguments in this case.

The bill was brought against several defendants, Duncan N. Hennen being one of them. They separated in their answers. Hennen, after giving the claim of title to the property for which he is sued, admits that it was a part of the estate of Daniel Clark, and adopts the answers filed by the other defendants as a part of his defence. The cause was tried with

respect to him only, and the bill was dismissed by the court below. From that decree Mrs. Gaines appealed to this court.

After specific declarations as to the character in which she sues, and her legal right to do so as the legitimate child of her father and his universal legatee, she acknowledges that he had made a provisional will in the year 1811. That he then made his mother, Mary Clark, his universal legatee, and named Richard Relf and Beverly Chew his executors. That they had presented it to the court for probate, that it had been allowed, and that they, as executors, had taken possession of the entire separate estate of Daniel Clark, and of all such as he claimed in his life in copartnership with Daniel W. Coxe. It is then assumed that the will of 1811 had been revoked by the will of the 13th July, 1813. That Chew was dead; that all the legal power which the probate of the will of 1811 had given to Relf and Chew had expired; that Mary Clark was dead, and that her heirs and legatees reside beyond the jurisdiction of the court.

Mrs. Gaines then states, in the language of equity pleading, the pretences of the defendants in opposition to her claims. Such as, that Relf and Chew sold them the property as testamentary executors of Daniel Clark under the will of 1811; that they bought for a full consideration, without any notice of the revocation of the will of 1811, or that any other person was interested in the property than Mary Clark; that the titles they had from Relf and Chew could not be invalidated by the revocation of that will, and that the right of action against them for the property in their possession, if complainant had ever had any, were barred by prescription—that is, by the acts of limitation of Louisiana. It is then charged by the complainant that Relf and Chew had no authority to sell the property of Daniel Clark when the sales were made by them. That they had never made an inventory of the decedent's property for the probate court before the sales were made; that the sales were made without any legal notice, and for an inadequate consideration. That if Relf and Chew had sold under a power of attorney from Mary Clark, and not as executors, that Mary Clark's power was insufficient in its terms for such pur-

pose; that she had no power or rights in the estate of Daniel Clark to give such a power, and that Relf and Chew had not caused themselves to be recognised in a proper court as Mary Clark's attorneys, as they ought to have done, before they could acquire any right to sell any part of the estate of Clark. She then charges that the defendants knew, when they bought the property sued for, that she had applied as early as in the year 1834 to have her father's olographic will of 1813 probated by the proper court at New Orleans; that the defendants knew of all the irregular proceedings and assumptions of Chew and Relf in respect to the estate of her father, and of their sales of it without authority; that the defendants knew, when they bought, of the suits which she had brought to recover her rights in her father's estate; and that her present suit was brought under the probate of the will of 1813 by the Supreme Court of Louisiana.

Hennen, the defendant, answers for himself, and adopting the answers of the other defendants, states that the property for which he was sued is designated according to a plan made in 1844, as lots 9, 10, 11, on the square comprised between Phillippi, Circus, and Poydras streets; each lot, by English measure, containing 23 feet 11 inches and 2 lines between **parallel lines.**

The answers of the other defendants make the same admissions as to their titles having been derived from or through Relf and Chew and Mary Clark; admit the property separately claimed by them to have been a part of the estate of Clark; and finally make an averment that Mrs. Gaines has not that civil status by her birth which, under the law of Louisiana, can entitle her to take the property of her father under the will of 1813, though it had been admitted to probate, and that she had been declared in it his legitimate and only daughter. In other words, the defendants have declared that she is an adulterous bastard.

It is proper to state the books and documents which are in evidence in this case.

1. The present record of Gaines *v.* Hennen.

2. The printed record of the suit No. 188, of December

term, 1851, in this court, Gaines *v.* Relf and Chew, 12 Howard, 472.

3. The proceedings in the courts of probate entitled Probate Record.

4. The commercial account-books kept by Relf and Chew, professing to relate to their transactions concerning the estate of Daniel Clark.

This testimony, as it has been enumerated, was brought into the case by agreement of the parties for as much as it might be worth, subject to exceptions by both sides as to its admissibility upon the trial of the cause.

Several immaterial or formal points were made in the argument to defeat the claims set out in this bill. Such as, that the case was not one for equity jurisdiction, but was, *ratione materiæ*, exclusively cognizable before the probate court of the 2d district of New Orleans. Next, that Chew and Relf, and Mary Clark, or her heirs, should have been made parties; that the sources of Daniel Clark's title to the property sued for had not been set out in the bill in addition to the manner it had been enumerated. Again: that the probate proceedings in the second district court of New Orleans in 1856 are yet pending and undetermined, and on that account that the same court has exclusive jurisdiction over the estate of Daniel Clark. We have examined these formal objections, and find them to be unsustained by the cases cited in support of them. They are inapplicable to the actual state of the case, and are insufficient to arrest the trial of it upon its merits. The same objections were also urged in the Circuit Court, but were disregarded, we presume, by the judge, as unsubstantial points of defence. As to the objection that Relf and Chew, and the heirs of Mary Clark, had not been made parties to the bill, we observe it was not necessary to make either of them so. The present is a suit for the recovery of property admitted by the defendants to have been a part of the estate of Daniel Clark. Nothing is sought to be recovered from Chew and Relf. Their executorial functions under the will of 1811 have long since been at an end. Had the bill involved directly their transactions as executors with the complainant, as universal legatee, upon a

proper showing of that, with a prayer to be made parties, the court might have allowed it. But not having done that, the defendants cannot urge, because Relf and Chew have not been made defendants with them, that they should escape from a trial on the rightfulness of their possession of a part of the estate of Clark, as they have admitted it to be; or that they had not acquired it under circumstances from which the law presumes that they had notice of the irregularity of the sale as it was made by Relf and Chew. Nor was it necessary for the heirs of Mary Clark to be made parties; for Mary Clark herself never had any pecuniary responsibilities for the sales of the property of the estate of her son by Relf and Chew, as her power of attorney to them upon its face was irregularly executed, and was of itself notice to the defendants that when they bought, the sales had not been made in conformity with the law of Louisiana regulating the sales of the property of a testamentary decedent.

But it was also said in the argument that no claim could be set up by Mrs. Gaines under the will of 1813 until the will of 1811 shall be set aside. Neither the language used by this court in 2 Howard, 651, nor in the decision in 12 Howard, will bear such an interpretation, or admit of such a conclusion. The rulings of courts must be considered always in reference to the subject-matter of litigation and the attitude of parties in relation to the point under discussion. And it will often be the case, as it is now, that counsel will use an illustration for a judicial ruling, or words correctly used when they were written as applicable to a different state of things. When this court said, in 12 Howard, 651, that the will of 1813 cannot be set up without the destruction of the will of 1811, it was with reference to the existing fact that the latter had been duly proved, and that it stood as a title to the succession of the estate of Daniel Clark, and that the will of 1813 had not then been proved before a court of probate, and on that account could not be set up in chancery as an inconsistent and opposing succession to the estate while the probate of the will of 1811 was standing in full force. And when Mr. Justice McLean, speaking for the court, 2 Howard, 647, says, "she (mean-

ing Mrs. Gaines, then the complainant) must ask for the probate of the will of 1813, and a revocation of the other will of 1811," adding "for no probate can stand while a previous one is unrevoked," it is plain that the meaning was, as we now say it is, when a court recalls the probate of a will, substituting the probate of another will by the same testator made posterior to the first, that the former becomes inoperative, and that the second is that under which the estate is to be administered, without any formal declaration by the court that the first was annulled, and it makes no difference that a part of the estate has been administered under the first probate. The unadministered must be done under the second. Courts of probate may for cause recall or annul testamentary letters, but they can neither destroy nor revoke wills; though they may and often have declared that a posterior will of a testator shall be recognised in the place of a prior will which had been proved, when it was not known to the court that the testator had revoked it. Such is exactly this case. The Supreme Court decreed that the will of Daniel Clark, dated New Orleans, July 13, 1813, as set forth in the plaintiff's petition, should be recognised as his last will and testament, and the same was ordered to be recorded and executed as such, *with the declaration*, that admitting the will to probate does not conclude any one who may desire to contest the will with the applicant in a direct action. The decree of the court in that particular is the law of the case.

It was also urged that the defendant and those under whom he claims were purchasers for a valuable consideration without notice, and are therefore in equity protected against the claims of the complainant. It is a good defence when it shall be proved as a matter of fact. But in this instance it is not only disproved by testimony introduced by the defendants, but by admissions in their answers, as shall be shown hereafter in this opinion. In our opinion the objection has no standing in this case, though the argument from which the counsel admitted he had borrowed it is a very good one in its proper place.

We shall now examine the case upon the more serious points.

made in opposition to Mrs. Gaines by the learned counsel, Mr. Janin.

The first was, that her claim was barred by prescription. The prescription relied upon by the defendants is that of ten years against one *claiming a vacant estate*, twenty years to prescribe a title, and thirty years to bar the faculty of accepting a succession or the estate of a deceased person. There being no vacant succession in this case, the ten years' prescription does not apply, and the prescription of twenty years does not exist; for Mrs. Gaines did not attain her majority until June or July, eighteen hundred and twenty-six, and her suit for the probate of the will made by her father on the 13th of July, 1813, *was instituted in* 1834. When her petition for that purpose was *dismissed in* 1836, her first bill was filed in a month or two afterwards. From that time there was a legal interruption of the prescription of twenty years, which the defendants have pleaded and now rely upon. In fact, they recognise the interruption in their answers. In their averment of their having had peaceable possession of the property sued for since they bought it, they add, "that they had never been disturbed in respect to it," *except by an abortive attempt of the complainant and her husband to recover* it by their bill filed in 1836. New Record, 47. We find them also in their answer (New Record, 54) admitting that such a suit as complainant refers to in her present bill had been instituted by her and her husband in 1836, and that the object of it *was the recovery of the "identical property"* now in controversy. New Record, 56, 57. It is also admitted in the answer, that the suit of the complainant in the probate court to annul the probate of the will of 1811, and to set up that of 1813, was brought *on the 18th June*, 1834. These admissions are decisive that the complainant claimed the inheritance as early as that date, and that the prescription which had begun to run had been legally interrupted on the 28th July, 1836, the date of her first bill.

By the article of the Code, 3484, a legal interruption of a prescription takes place where the possessor has been called to appear before a court of justice either on account of the property or the possession, and the prescription is interrupted by

such demand, whether the suit has been brought before a court of competent jurisdiction or not.

The weight of authority upon the construction of that article of the Code is, that it contemplates a voluntary, intentional, and active abandonment of the suit, in order to restore the running of a right of prescription. In the case of Wilson *v.* Marshall, 10th Annual, 331, the court said the plaintiff did not dismiss the suit, or consent to the dismissal. She lived in a remote part of the State, and the mere absence of herself and counsel at a term of the court when her case was called is insufficient, without other evidence, to convict her of having abandoned her demand. Pratt *v.* Peck, curator, 3 Lea R., 282; Dunn *v.* Kenney, 11 Rob., 250; Roswood *v.* Duvall, 7 Annual, 528; Mechanic and Traders' Bank *v.* Theatt, 8 Annual, 469.

After the interruption of the prescription by the filing of the bill by the complainant, the defendants could no longer claim to be in possession *in good faith*, as that is defined in the Civil Code. In article 3415 the possessor in bad faith is he who possesses as master, but who assumes this quality when he well knows that he has no title to the thing, *or that his title is vicious and defective.* The possessor must not only not be in bad faith, but in the positive belief that he is the true owner, and if he doubts the validity of his title, his possession is not the basis of prescription. Troplong Prescription, vol. 2, p. 451, No. 927: Ib., p. 444, No. 918; Ib., p. 442, No. 915. The plea of prescription is not available in this case.

But the defendants go further, and insinuate that their possession of the property, though beginning with the executors, Relf and Chew, continued afterwards under Mary Clark, whose power of attorney to them authorized them to sell the estate of Clark.

When Relf and Chew proved the will of 1811, they received the estate of Clark as executors, with a right of detainer for one year, and for as long afterwards as the court of probate might permit upon their application, showing cause for the delay or the extension of a longer time. They did receive such an extension for three years upon their representation

that the nature of the estate, the difficulty of the time, and the ample sufficiency of the estate to pay all of its debts, would enable them by the delay to accomplish that result. The creditors were called upon to meet to consider the proposition They assented to it. But the executors never fulfilled the arrangement, either for the benefit of the creditors or for the legatees under the will of 1811. Nor did they ever make any return to the court of probates of their transactions relative to Clark's estate until 1836, after the complainant had sued them, and then without vouchers to homologate their receipts, expenditures, and payments, except for a small part. Shortly after the application for an extension of time, in the year 1813, they applied for a power of attorney from Mary Clark, who had been named in the will of 1811 as universal legatee, to authorize them to sell the estate in her behalf. The power was given; and under it, without any notice to the court of probate, which ought to have been given, and the power filed in it, they continued, as the testimony in this case shows, to act as executors, and to dispose of the estate of Clark, both real and personal, property in copartnership, and other property separately belonging to Clark, without ever having received any permission to do so from the court of probate, and that should have been obtained, as Mary Clark had not been acknowledged by that court as the universal legatee of Clark. It may be that they mistook their powers in doing so; but they received the estate of Clark in a fiduciary character, to be accounted for to the legatees and creditors, according to their rights under the law of Louisiana, and for that they are responsible. Besides, the power from Mary Clark was given to them as executors, that she might have the benefit of those responsibilities for the faithful execution of the trust that they were under by the law of Louisiana as executors. They paid debts, received moneys, sold property, and acted throughout as if they were not responsible to the court from which they derived their testamentary letters or to Mary Clark, and, as the record in this case shows, without sustaining their transactions by vouchers of any kind.

Nothing is better settled by the decisions of its courts in

Louisiana than "that an extra judicial statement by an execu-tor, that he believes the debt to be due by the estate, does not bind the heir, nor is the heir bound by the approval of a court, as to such a claim, if it be made *ex parte*." 4 Lou. R., 382. Again: that the admission of the genuineness of the signature to vouchers, filed by the curator of a succession in support of his account, dispenses with any other proof of the payment claimed; but when such payments are made *without an order of the court*, the curator must show that the debts were really due by the succession, or he will not be entitled to credit for the amounts so paid. Miller *v.* Miller, 12 R. A receipt given to an administrator for the payment of an account is not evi-dence that the account was due, if the fact of being due is dis-puted. Moore *v.* Thebadeaux, 4th Annual, 74. So an admin-istrator who renders an account is bound to establish the items of it by evidence, and may be held to strict proof by the par-ties interested without a formal opposition on their part. Suc-cession of Lea, 4th Annual, 579. The accounts of Relf and Chew were put in evidence by the defendants, and they were used to show, among other things, that they were authorized to sell the estate of Clark as they did, and that they were aux-iliary for the establishment of the defendant's plea of prescrip-tion. Such, however, is not our opinion, and but for the use made of them, we should not have noticed them at all, not thinking that they are put in issue by the bill of the complain-ant, or the answer of the defendants, particularly as Relf and Chew are not parties to this proceeding.

We will now proceed to the consideration of that point made in the argument by the counsel of the defendant, but more particularly representing the city of New Orleans, as he said he did.

It was that complainant's suit could not be maintained, be-cause it was *res adjudicata* by this court in its judgment in the case of Gaines *v.* Relf and Chew, in 12 Howard, 506.

We do not think so. That case is misunderstood by the learned counsel. Then the parties went to trial upon the de-mand of Mrs. Gaines for one-half of her father's estate, as the donee of her mother, his widow, and as *forced heir of her father*

by the law of Louisiana *for four-fifths of another half of his estate.*

Her bill then was brought in consequence of this court having decided, in 6 Howard, 550, that there had been a lawful marriage solemnized in good faith between them in Philadelphia. That case was tried upon the same evidence upon which the appeal was determined in 12 Howard, with the exception of what is miscalled an ecclesiastical record from the Cathedral church in New Orleans, of which we shall have much to say hereafter. Besides having decided, in 6 Howard, that there had been a lawful marriage between the complainant's father and mother, this court decreed that Mrs. Gaines was the lawful and only issue of the marriage; that at the time of her father's death she was his only legitimate child, and was exclusively invested with *the character of his forced heir,* and as such was entitled to its rights in his estate.

The judgment in that case has never been overruled or impaired by this court. It certainly was not intended to be by the case in 12 Howard, for the report in that case shows, from the number of the justices who sat upon its trial, and their decision as to the judgment then to be rendered, that the majority of them did not intend to overrule the decree in 6 Howard. It was recognised again as still in force by a majority of the judges who sat in this case in our consultation. The defendant in the case of 1851, 12 Howard, 537, admitted that such a decree was rendered, denying, however, that it was conclusive upon or that it ought to affect their right; and if it could do so, it ought not to have such an effect in that instance, averring the same as a matter of defence, that the decree was brought about and procured by imposition, combination, and fraud, between the complainants and Charles Patterson. That it should not be regarded in a court of justice for any purpose whatever, and that it had been consented to by Patterson to enable the complainant to plead the same as *res judicata* upon points in litigation not honestly contested. Mr. Janin was mistaken when he said that the decree in 6 Howard, 583, had been reviewed in the case of 12 Howard, 537, meaning thereby that it had been overruled. It was not only not so, but one of

the justices who assented to the judgment in 6 Howard, which declares that there had been a valid marriage between Daniel Clark and Zulime Carriere, and that she was the legitimate child of that marriage, would not assent to its being done when he concurred in the decree in 12 Howard.

The decision in 12 Howard does not, either in terms or inferentially, assert that no marriage had ever taken place between Daniel Clark and the complainant's mother. The issue in that case was, that at the time of the complainant's birth, her mother was the lawful wife of another man, namely, of Jerome Des Grange.

It was, therefore, essential to the defendants to get rid of the decree which had affirmed the legitimacy of Mrs. Gaines and of the marriage of her father and mother, and it was attempted by a contrivance as extraordinary in its beginning as it was abortive in its result. We will show what it was from the record, not only on account of its anomalous character, but because it is unexampled in jurisprudence.

After having asserted that the decree in 6 Howard had been obtained by the fraud of Patterson and General Gaines, thus impeaching the credibility of Patterson in advance, the defendants, Relf and Chew, introduced him as their witness, (Old Record, pp. 590, 591, 592, 593, 594,) and he was examined by their counsel, first as to a suit in which Mrs. Gaines had recovered a house and lot from him. After stating his age to be about seventy, his answer was: "It was for a house and lot on which I resided when the suit was brought; I still reside in that house and lot, and have done so ever since the suit was brought. Mrs. Gaines succeeded in the suit, according to the judgment of the court. That house and lot belongs to her, but they told me they would not take it from me. General Gaines and his wife gave me in writing under their hands that they would not take the property from me; that he would make my title good. The property has always been assessed as mine, and I have always paid the taxes on it. I paid most of the costs, but they paid me again—that is, General and Mrs. Gaines. There was an understanding between us that they would pay the costs, even should the suit be deci-

ded against me. They made the same offer to Judge Martin." In his cross-examination, witness said he had made the best effort in his power, with the aid of able counsel, to defeat Mrs. Gaines in her suit. The cross-examination was resumed the next day, 20th June, 1849. Patterson was asked to look upon a document marked A, and to state if he knew the handwriting of the late General Gaines; whether the signature to it was not his; whether he had received that, or a communication of which that was a copy, prior to withdrawing his dilatory pleading in the case of Gaines *v.* Relf and Chew et al., and filing your answer to the merits of that case. The defendants, by counsel, protested against the paper being put into the record, on the ground that it contained false, malicious, and gratuitous imputations against parties in no wise connected with the suit. Witness then answered, that was the signature of General Gaines; he had often received letters from him, and seen him write, and that he had received two or three communications, of which that was a copy, before he withdrew his dilatory pleadings in that case, and answering to the merits. A letter was then handed to witness, marked B. He answered, the body of it was the handwriting of General Gaines; was present when he wrote it, and saw both General and Mrs. Gaines sign it. Then the following question was put to the witness: "At the trial of your cause with Gaines and wife, did not your counsel make a request of the counsel of Mrs. Gaines to be permitted to introduce the record from the probate court of New Orleans of all the proceedings of Mrs. Gaines in the prosecution of her rights in that court?" Witness answers: "Yes, sir; her counsel objected to that, and I applied to General and Mrs. Gaines to introduce the record. They replied to me to get all the evidence possible, the stronger the better. General Gaines remarked, it would be more glorious to have it as strong as possible. I then caused it to be introduced." Here the cross-examination of the witness was closed. The counsel for the defendants objected to the foregoing testimony, and especially to that part which relates the conversations of the complainants with the witness, and that part which details what was done in *a judicial proceeding*,

*on the grounds*, among others, that it is incompetent for the complainants to make evidence for themselves, and *that what had been done in judicial proceedings should be shown by the record.* And from that gentleman's accurate knowledge of his profession, indicated as it has been by the two lines just underscored, may we not say in the zeal of professional advocacy that the best of us may forget it? for what has been his interrogation of Patterson but an attempt to invalidate a judgment against him by the testimony of the most interested party to have it annulled, without having made any appeal to the record of that judgment? And Patterson was the defendant's witness.

But we have not yet done with this attempt to prejudice the rights of Mrs. Gaines by suggestions that her suit with Patterson was pretensive and fraudulent, and to extract from him some proof or confession of his own infamy.

After the examination in chief and the cross-examination had been completed and signed by the witness, and both counsel had announced that they had concluded their examination, the counsel for the defendant made another objection to the cross-examination of Mr. Patterson, insisting that it should be considered as his examination in chief by the complainant, to which the defendants had the right of cross-examination; and the witness was recalled on the following day for that purpose. Every effort was then made by many questions to extract from him some inconsistency with his first examination without success. But fortunately for his own character he removes the imputation of fraud and combination between himself and General Gaines, to give to the latter the benefit of a collusive judgment in the circuit court against himself, by having, in his answer to one of the questions, alluded again to the documents A and B, which are now presented as conclusive against the charge that there was ever any combination between them, by trick or by contrivance, or by any deceitful agreement or compact, for a suit to be brought by one against the other to defraud any third person of his right. See Old Record, pages 1018 for Document A, and 819 for letter B. And when the witness was asked if

he had not been particularly requested by the General and Mrs. Gaines to use his best exertions, with the aid of the best counsel he could employ, to make every defence in his power to this suit of which it was susceptible, he answered: Yes, and I did so; and I considered the agreement with General and Mrs. Gaines as an act of liberality on their part, growing out of a desire to come to a speedy trial with some one or more of the defendants on the merits of the case.

It was an indiscreet arrangement between General Gaines and Mr. Patterson, not to be tolerated in a court of justice, but not one of intentional deception in contemplation of any undue advantage. And it would never have been made by Relf and Chew, in their answer to the subsequent bill of the complainant against them, had they not been erroneously advised that the decree in sixth Howard, establishing the marriage of Clark and Zulime Carriere, and the legitimacy of Mrs. Gaines, might be used as *res judicata* against the defendants in the suit of the 20th January, 1849, and as they now attempt to make the decision in that case a *res judicata* against the claims of Mrs. Gaines in this which we are now deciding.

But what was decided in the case in 12 Howard? It is sta ted, in the language of the decision, "that the first and most important of the issues presented is that of the legitimacy of Mrs. Gaines." Then are stated the pleadings under which the issue was made. It shall be given in the language of the decision: "She (Mrs. Gaines) alleges that her father, Daniel Clark, was married to Zulime Nee Carriere, in the city of Philadelphia, in the year 1802 or 1803, and that she is the legitimate and only legitimate offspring of that marriage. The defendants deny that Daniel Clark was married to Zulime at the time and place alleged, or at any other time and place. And they further *aver* that, at the time the marriage is alleged to have taken place, the said Zulime was the lawful wife of one Jerome des Grange. If the mother of the complainant was the lawful wife of Jerome des Grange at the time Zulime is alleged to have married with Clark, then the marriage is merely void, and it is immaterial whether it did or did not take place. *And the first question we propose to examine is, as to the*

*fact whether Zulime was Des Grange's lawful wife in 1802 or 1803.*" Then follows the recital of the marriage between Des Grange and Zulime, with the record of it, on the 2d December, 1794, admitted on the part of Mrs. Gaines. To rebut and overcome the established and admitted fact of that marriage, the complainant introduced witnesses to prove, "that previous to Des Grange's marriage with Zulime he had lawfully married another woman, who was living when he married Zulime, and was still his wife, and therefore the second marriage was void, *and this issue we are called on to try.*"

Then it is said that "the marriage with Des Grange having been proved, it was established as *prima facie* true that Zulime was not the lawful wife of Clark, and the onus of proving that Des Grange had a former wife living when he married Zulime was imposed on the complainant; she was bound to prove the affirmative fact that Des Grange had committed bigamy." Then follows the recital of the testimony of the complainant to prove that Des Grange became a bigamist by his marriage with her mother. And then, to "meet and rebut this evidence, the defendants introduced from the records of the Cathedral church of the diocese, to which New Orleans belonged at that period, an ecclesiastical proceeding against Des Grange for bigamy, which respondents insist is the same to which complainants refer." It is set out in full in the decision, beginning at page 513 in 12 Howard, extending to 519, inclusive. Then the rebutting testimony of Daniel W. Coxe, for a long time a copartner in business with Clark, was introduced. He states an antecedent connection between Clark and Zulime to the time of their alleged marriage, with a confidential letter to him, which was delivered by Zulime, in which it was stated that she was pregnant, and that he, Clark, was the father of the child; further, requesting that he would put her under the care of a respectable physician, and furnish her with money during her confinement and stay in Philadelphia; and further, that she gave birth to a child, who was Caroline Barnes, who before her marriage went by the name of Caroline Clark, and that what has been related happened in 1802; and he further states that Clark was not in Philadelphia in 1803, having

gone to Europe in August, 1802, and having returned to New Orleans early in 1803. A letter from Des Grange was introduced, dated at Bordeaux, July, 1801; also a suit for alimony brought by Zulime against Des Grange in 1805, which will be further noticed in the opinion. Then it is said: "This is substantially the evidence on both sides on which the question depends, *whether Des Grange was or was not guilty of bigamy* in marrying Maria Julia Nee Carriere in 1794. Objections are taken to several portions of this evidence, and especially as respects the record of the suit against Des Grange for bigamy in the ecclesiastical court." And though this is followed in the decision by a suggestive, able, and searching commentary upon the objections made to the testimony of the defendants, and upon that of the complainant, by connection and comparison of the two, and upon what was deemed the law of the case, all of it relates exclusively to disprove that Des Grange was married, and had a wife alive when he married Zulime.

The announced conclusions in that case, which were seven in number, 12 Howard, 539, show it to have been so. It was "the question decided," and was said "concludes this controversy." The factum of marriage between Clark and Zulime, and the legitimacy of Mrs. Gaines, as both had been decreed by this court, were not then disaffirmed, either directly or inferentially, and all that was said about it is, "that the decree of this court in Patterson's case does not affect these defendants, for two reasons: 1. Because they were no parties to it; and, 2d, because it was no earnest controversy."

It is our opinion that the decision made in the case in 12 Howard was not intended to reverse the decree in 6 Howard, and that it cannot be so applied as *res judicata* to the case we are now trying.

We will now show the difference as to the character in which Mrs. Gaines then sued and that in which she now does, in connection with the law of Louisiana, as to what constitutes a *res adjudicata*, and what does not.

In the first, her demand was for one-half, and four-fifths of another half of the property owned by her father when he died. She then claimed as the donee of her mother to the one-half,

and as *forced heir of her father* to four-fifths·of another half of his estate. Now she claims as universal legatee and legitimate child of her father, under his will of the 13th July, 1813, which has been admitted to probate by the Supreme Court of Louisiana, and ordered to be executed as such.

The difference between the two cases is just that which the law of Louisiana will not permit the decision in the first to be pleaded against her in this case as a *res judicata.*

It is declared in the article 2265 of the Louisiana Code, "that the authority of the thing adjudged takes place only with respect to what was *the object of the judgment.* The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be made between the same parties, and formed by them against each *other in the same quality.*"

The case in 12 Howard and that now under our consideration are dissimilar as to parties and things sued for, or what is called "the object of the judgment." The suit now is not between. Mrs. Gaines and Relf and Chew, but between herself as complainant, and Duncan N. Hennen as defendant. Nothing was said in the first suit of the claim of Mrs. Gaines under the will upon which she now sues, as in every particular detailed in the article 2265. There are differences between her present cause of action and that formerly made, and the demand now made is not between the same parties, or formed against each in the same quality. And, therefore, upon well-settled principles coincident with the article 2265, and also independent of it, nothing that was said or done in the case in 12 Howard can prejudice her claim as she now makes it. We give the authorities for that position, that they may be consulted, without being able, for want of time, to show their application by extracts. 24 Wend., 585; 14 Peters, 406; 1 Dana, 109; 3 Wend., 27; 2 Sim. and Stuart, 464; 6 Wheaton, 109; 7 Cranch, 565; 3 East., 346; 4 Gill and Johnson, 360; Preston *v.* Slocomb, 10 Reports, (Louisiana,) 361; 1 Annual, 42; 3 Annual, 530; 10 Annual, 682; 3 Martin, 465; 7 Martin, 727; 7 Reports, 46. And the precise point was ruled in Burt *v.* Steinberger, 4 Cowen, 563—4, "that the defendant might have

shown, if he could, that he had acquired a title since the former trial, or any title other than that which had been passed upon in the former trial."

We are fully satisfied from the article 2265, and the cases cited from the Louisiana courts, and from the English and American reports, that the objection of *res judicata*, as made against the recovery of the complainant in this case, is without any foundation in law.

We have now reached the last and most important objection made against the complainant's recovery. But before discussing it directly, we must dispose of the ecclesiastical record, which was much relied upon in the argument to repel the evidence of her legitimacy, and to establish the fact that the marriage between her father and mother was unlawful, from her having been then the lawful wife of Jerome Des Grange; in other words, that Des Grange did not commit bigamy when he married her, by which she was not released from her conjugal relations with him, and had not the right to marry any other man who was free to contract marriage.

We have seen that exceptions were taken to the admissibility of that record as evidence when it was first presented by the defendant's counsel in the case before the Circuit Court. They were renewed upon the appeal here. They were continued when the defendants introduced it again into this case, and it is necessarily before us to be determined as a question of law, whatever may have been thought of it heretofore, either by judges or by counsel.

Our first remark concerning it is, admitting that the canon law, as sanctioned by the church of Rome, was in force in Louisiana at the time of this procedure, it was a mere assumption, without authority in its beginning, tyrannous against the object of it, and irregular in its action. It was a nullity, *coram non judice*, before the canon who issued it. The presbyter canon who assumed to do so was not vicar general or governor of the bishoprick of Louisiana and the two Floridas. He was only the presbyter canon of a vacant see, without delegation by commission or deputation from a bishop to represent him in his spiritual offices and powers. He had no canonical power

in his pastoral charge of a particular church and congregation to originate a prosecution for bigamy. Nor would either arch-bishop or bishop, had there been either then in Louisiana, have ventured to do so in the condition at that time of the ecclesiastical practice and royal ordinances of Spain, especially in their application to its foreign possessions. And such a procedure was a direct violation of the Instituciones de derecho canonico Americano por El Rev. Sr. D. Justo Donoso.

The inquisition, as it had existed for more than a hundred years in France and Italy, was introduced into Spain by Greg-ory IX, about the middle of the 13th century. It encountered no opposition there. It at first attained a prevalence and ex-tension of power larger than it had exercised before, and was on the increase when Spain became an united kingdom under Ferdinand and Isabella. They were authorized by the bull of Sextus IV to establish the inquisition in their States. And then it was invested with jurisdiction of heresies of all kinds, and also of sorcery, Judaism, Mahomedanism, offences against nature, and polygamy, with power to punish them, from tem-porary confinement and severe penances to the san benito and the auto de fé. Before that time the inquisition had exercised a capricious jurisdiction, both as to persons and creeds. En-cyclopædia Britannica, 8 edition, 11 vol., art. Inqui., page 386. In its new form it met with opposition. Attempts were made in Castile and Arragon to repulse its authority and to restrain the holy office, as it encroached upon government and deprived the people of many of their ancient rights and privileges. Its power, however, became triumphant, and so aggressive upon the royal authority that it was resisted by the Kings of Spain, as well in the kingdom as in its foreign possessions.

It cannot be expected that we shall enter chronologically into such a detail. We will verify what has just been said by distinct citations from the laws of Spain and royal ordinances.

The first of these ordinances which we shall cite is that of Charles I of Spain, (5 of Germany,) issued at Madrid on the 21st September, 1530; Leyes de Indias, tom. 1, livre 1, titulo 10, page 48.

Charles had been about twelve years in Spain   The mines

of the West had begun to throw their treasures into Spain They were essential to the accomplishment of the political and military designs of the King, and to his necessities also. Complaints were constantly being made of the rigors of the inquisition upon the Indians in his western dominions, and upon his subjects who had emigrated to them in large numbers in pursuit of gold. It was said but for such causes that the yield of gold would have been larger. The King determined to restrain the holy office in its jurisdiction, and issued his decree of September 21, 1530. We give Judge Foulhouse's translation of it: "We order the attorneys, police officers, sheriffs, and other ministerial officers *of the prelates and ecclesiastical judges of our West Indies, islands, and continents along the ocean,* not to arrest any layman, or issue any execution against him or his property, for any reason whatever; and we order all clerks and notaries not to sign, seal, or take any deposition with regard to the same, or for any reason thereto relating; and whenever ecclesiastical judges shall judge necessary to have a person imprisoned or an execution issued, they shall pray for the royal aid of our secular justices, who shall grant it according to law. And all vicars and ecclesiastical judges shall observe this order and comply with it, as is prescribed by this law, under penalty of losing the status and privileges which they enjoy in the Indies, and of being there held as foreigners and strangers to the same. And any of said attorneys, police officers, sheriffs, clerks, and notaries, and any other who do the contrary, shall be forever exiled from all of our Indies, and all of their goods shall be confiscated for the profit of our royal treasures; and we hereby direct and empower all of our justices, and all of our subjects and settlers, not to consent thereto, and let the attorneys or executing officers do so, too; and we order that this ordinance be observed, any contrary custom notwithstanding."

The ordinance of Charles was followed by another of his son, Philip 2, which declared, "that whenever in our royal courts of the Indies the aid of the secular arm shall be asked by the prelates and ecclesiastical judges, either for an arrest or for execution, the demand shall be by petition, and not by

requisition." These royal ordinances will be found in the re-copilacion in the Indies. They were declared by a law of Don Carlos 2, one hundred and thirty years after they were pro-mulgated, to be existing laws, on the 18th May, 1680. See the law to that effect preceding the Titulo Primero in Libro Primero, fo. 1, Recopilacion Leyes de Indies. They have had their places in every edition of the recopilacion since. Indeed, they were never abrogated, and were in practical operation in all of the dominions of Spain in America until she lost them.

They establish satisfactorily that the presbyter canon, Has-set, when he issued his prosecution against Jerome Des Grange for bigamy and imprisoned him, that he did so contrary to law, and that his whole proceeding in the matter was a nullity, and, as such, inadmissible as record evidence in a secular or ecclesiastical court. Recopilacion de leyes de los reynos de las Indies; En Madrid, por Andres, Ortega, ano. de 1774; Tercera Edicion, page 48.

But there are other royal ordinances establishing what has just been said in respect to the nullity of that procedure, be-cause they bear directly upon the incapacity of the ecclesias-tical power to originate a prosecution for bigamy.

The first of them which we shall cite is a cedule of March 19, 1754, in which it was declared that polygamy was a crime of a mixed nature, in which the royal tribunals may take cog-nizance in the first instance, with this qualification, that if the inquisition wishes to punish the accused for suspicion of her-esy, he shall be remitted to it after having suffered the legal penalties. Leyes de Indies, c. 1, tit. 19, not. 2.

But this cedule was modified in 1761 by Charles 3, leaving to the inquisition cognizance of this crime, and reserving only to the secular courts the power to take informations, and to arrest the accused in order to deliver him, to the inquisition. This concession was made by the King, who ascended the throne at a period peculiarly critical, requiring the conciliation of every agency in his new kingdom to meet the pressure of political difficulties, and to allay discontents and suspicions against himself, which subsequently became a revolt. He was

charged with being opposed to the inquisition, from having been on the throne of Naples for several years, where it had never been introduced, the people having always resisted its establishment over them

But the prudence of the King did not restrain the inquisition from the assertion of its jurisdiction in that and in other particulars offensively to the ancient usages and rights of Spain. In its eagerness to extend its power, it invaded the royal authority, and stretched its jurisdiction to every cause in the slightest degree connected with ecclesiastical discipline or punishment. The King resisted it, and he was soon furnished with a cause for doing so. The inquisition having taken from the auditor of the army a process instituted against an old veteran who was accused of bigamy, the jealousy which the King in fact entertained against the inquisition was revived. His vigilant minister, d'Aranda, used it to obtain a royal decree, ordering the process against bigamy to be restored to the civil or secular courts. It also enjoined upon the inquisition to abstain from interfering with the proceedings of the secular courts; required it to confine itself to its proper functions in the prosecution of apostacy and heresy; forbade it to " defame with imprisonment his vassals before they were *previously and publicly convicted,*" and commands the inquisitor general to require the inquisitors to observe the laws of the kingdom in cases of that kind; and further, all the King's royal tribunals, judges, and justices, were ordered to keep and obey the decree, and to punish those who should violate it in any manner whatever. This was the decree of Charles 3, of the fifth of February, 1770, cited by Judge Foulhouse in his opinion upon the nullity of the proceedings against Jerome Des Grange, by the assumption of the presbyter canon, Hasset, of the Cathedral church of New Orleans. For the royal decree of the 5th February, 1770, see original, the Novissima Recopilacion, vol. 5, p. 425; Coxe's Memoirs of the Kings of Spain, 3 vol., ch. 57, page 367.

Thus stood the jurisdiction of the inquisition in respect to the crime of bigamy restrained by royal authority for six years. Complaints were then made of the uncertainty of the royal

cedule of the 5th February, 1770, especially in respect to the extent of its interference with the power of the holy office to inquire for discipline and for punishment into cases of polygamy. The King was induced to call a toro or council, to discuss the different relations and boundaries between the secular and ecclesiastical cognizances of the crime of bigamy. The result of that council was communicated to the King on the 6th September, 1777. It was that a majority of it had come to a conclusion, that by the act of marrying a second time whilst the first wife was alive, the person who does so violates the faith due to the marriage contract; that he deceives the second wife and wrongs the first; inverts the order of succession, and of the legitimacy established by the laws, *inasmuch as his fraud makes the children of the second matrimony, though truly adulterine, legitimate, and capable to inherit from their parents* on account of the good faith of their mother in contracting that marriage; further, that the kingdoms of Spain assembled in Cortes had established penalties against the crime of bigamy, commanding that they should be imposed by the royal courts, and declaring that they should not be embarrassed in their cognizance of the offence; also, that he who marries a second time, his first wife being living, offends the ordinary jurisdiction in maliciously deceiving the curate to assist at a null marriage, and that on that account there is ecclesiastical jurisdiction to inquire into the validity or nullity of marriages; but that it was to be done without embarrassing the royal courts in their cognizance of the offence. It was then said that such persons may also incur the crime of a false profession of the sacraments, which was exclusively within the jurisdiction of the holy office; which was, however, to be exercised reciprocally by it and the secular courts, to prevent the repetition of the offence by the imposition of penalties which belong to each, and by the delivery of prisoners from one to the other to be tried. Upon the foregoing report being made to the King, he gave a royal order to be communicated to the inquisitor general, that by his cedule of the 5th February, 1770, the holy office was not impeded in the cognizance of the crimes of heresy and apostacy, and of persons declared subject to

suspicion of bad conscience by the violation of apostolic bulls which had been received and enforced in Spain with royal consent, in those cases in which the jurisdiction of them was in the holy office. This royal resolution was followed by another decree, remitted to the Alcaldro and to the chancery and audiences of the kingdom on the 20th February, 1782. Novissima Recopilacion, page 425 of vol. 5, Ley., 10; Note 1, Tercera Edicion, Madrid, por Andres, Ortega, 1774.

The result of the council, however, of which we have just given the particulars, did not satisfy the grand inquisitor. Attempts were made to reassert his assumed jurisdiction in all its plenitude, both in Spain and its foreign dominions. The holy office was on its decline. This was its last great struggle for existence. The King had long resided in Naples, where the inquisition was regarded with the same horror as among Protestants. Though partaking of the same feeling, he was too prudent to trample on the prejudices and opinions of his Spanish subjects, or to make a direct attack against that great engine of ecclesiastical authority. He had witnessed the danger of precipitate reforms and of shocking national prejudices in matters however beneficial. He adopted in his long reign the only maxim which could be pursued with safety, and perhaps the only means to produce the intended effect: He endeavored to check the oppressions, to soften the rigors, and to circumscribe the authority of the inquisition, and thus prepared the way for time and circumstances to produce its total abolition. In the pursuit of this design he was seconded by the energy and liberal principles of his minister, Florida Blanca. The principal restrictions of de Aranda were gradually revived; and in 1784 the celebrated decree was issued, which partially subjected the proceedings of the holy office to the cognizance of the Sovereign. It was ordered that no grandee, minister, or any person in civil or military service of the Crown, should be subjected to a process without the approbation of the King. Thenceforth this formidable tribunal became feeble in its operations, and was suffered only to give such displays of its authority as were calculated to weaken the public veneration. Coxe's Memoirs of the Kings of Spain, vol. 3,

pages 526, 527, &c. Under the reign of the son of Charles, the Prince of Asturias, his successor in Spain and the Indies, "the inquisition received a still heavier shock, and before the late revolution it had become a mere tribunal of police, to arrest the progress of political, rather than of religious heresy." It was finally abolished in Spain in 1808.

It appears, then, from the royal ordinances which have been cited, that from the time of the introduction of the inquisition into Spain the extent and manner for the exercise of its jurisdiction were subject to the regulations of royal ordinances; that it had been so restrained in polygamous cases, its jurisdiction in them having been confined to inquiries connected with the validity or nullity of marriages, and to the infliction of penances for the violation of the ecclesiastical law in respect to them. It had not the power to initiate a process in a case of bigamy for the punishment of it but in subjection to the royal ordinances, or to institute in the Indies, after those ordinances were passed, an inquisitorial tribunal concerning it before the accused had been convicted in the secular courts.

Such was the law of Spain in respect to prosecution for bigamy, and the sunken condition of the inquisition, when no ecclesiastic, however high may have been his dignity, would have ventured to make such a decree as was issued by the presbyter canon of the Cathedral church of New Orleans against Jerome Des Grange for bigamy. It had all the form and more than the vigor of the holy office. It was entitled "Criminal proceedings instituted against Geronimo Des Grange for bigamy by the Vicar General and Governor of the Bishoprick of this Province, and attested by the notary, Franco Bermudez." The canon subsequently styles himself canonical presbyter of this Holy Cathedral church, which he was; but adds that he was Provisory Vicar General and Governor of the Bishoprick of the Province, which he was not. This assumption was either ignorance, or was intended to give consideration to himself or to the prosecution. He was neither Provisor nor Vicar General. For the manner in which those functions were deputed by the bishop, we refer to the 3d volume of the Instituciones de Derecho Canonico Americano;

Appendice Primero, pages 394, 395, 396, 398. The decree purports to have been issued on the 4th of September, 1802. It begins by saying that it had been publicly stated in this city that Geronimo Des Grange, who had been married in 1794 to Maria Julia Carriere, was at that time married before the Church to Barbara Jeanbelle, and is so now, who has just arrived; and also, that Des Grange, having just arrived from France a few months since, has caused another woman to come here, whose name will be obtained. It is also reported in all the city, publicly and notoriously, that Des Grange has three wives, and not being able to keep it a secret, &c., &c., his excellency has ordered, in order to proceed in the investigation and the infliction of the corresponding penalty, that testimony be produced to substantiate his being a single man, which Des Grange presented in order to consummate the marriage, and that all should appear who can give any information in the matter, &c., &c. And as it has been ascertained that Des Grange is about to leave the city with the last of his three wives, let him be placed in the public prison during these proceedings, with the aid of one of the alcaldes, this decree serving as an order, which his excellency has approved, and as such it is signed by me, notary. Before me,

FRANCO BERMUDEZ.

(Signed,) THOMAS HASSETT.

It is not necessary to cite any of the proceedings upon that paper, or to speak of the frequently-occurring notarial certificates of Francisco Bermudez. The whole of it, however, shows that what was done was so under his contrivance and auspices. The canon, Hassett, is made to begin as an ecclesiastic in authority, and signs the decree, but places the execution of it and the imprisonment of Des Grange upon an order of his excellency. It is twice referred to in the paper as a part of it. It should have been produced with the other proceedings. Without that being done, no part of it can be received in evidence as the record of an authentic judicial tribunal. The whole paper is a novelty in the proceeding of an ecclesiastical court. His excellency means the chief alcalde of the city, who had no legal authority under the law of Spain to sanction such

a prosecution, or to order the execution of it, either by the introduction of testimony or the imprisonment of the accused. The paper signed by Franco Cassiergues is insufficient for that purpose.

The procedure of the holy office in such cases will be found in the article Inquisition, in the 8th edition of the Encyclopædia Britannica, volume 12, page 389. It establishes the fact that the canon, Hassett, and Bermudez, intended to proceed against Des Grange according to the forms of the holy office, and that at a time when its functions in such particulars had ceased in Spain and in the Indies. Those who are curious may also find directions for such a procedure in Burns's Ecclesiastical Law, and in Ougton's Ordo Judiciorum sive Methodus Procedendo in Negotiis et Litibus in foro Ecclesiastico Civili Britannico et Hibernico, 2d volume. Mr. Bentham, also, in his Rationale of Judicial Evidence, specially applied to English practice, volume 2, book 3, chapter 17, pages 380 to 403, exposes with cogent reasoning and admirable satire the artifices of the early English ecclesiastics, and their success in getting up a similar initiation of a prosecution in contravention of English statutes.

Before leaving the paper we have been examining, it is proper for us to allude to the testimony of Judge Foulhouse given in this case, and to his opinion given afterwards in confirmation of its invalidity.

When he was examined as a witness, it was distinctly understood between the parties, and agreed to, that the defendants might make a motion to suppress his testimony. That was not done. We cannot infer from it that the counsel of the defendants acquiesced in the witness's conclusion that the paper from the Cathedral church was inadmissible as evidence, but it is certainly good cause for the reliance placed by counsel in their argument of the cause upon the learned judge's declarations, and his support of them by his researches. He cites from the Partida, 7 tit., law 16; Novissima Recopilacion, book 12, tit. 28, law 16; Novissima R., book 12, tit. 28, law 10; the last being the cedule of Charles 3 in a case of imputed bigamy, ordering the inquisitor general to direct the inquisitors to take cognizance of the crimes of heresy and apostacy,

bigamy being considered by the canon law as a kind of heresy, without assuming to do so "*by defaming the accused with imprisonment* before they had been previously and publicly convicted."

For the reasons given, supported by the royal ordinances of Spain, we have been brought to the conclusion that the paper from the Cathedral church of New Orleans, introduced by the defendants as a part of their evidence in this case, is inadmissible as such, and that all which it contains must be disregarded by us in the judgment we shall give.

We finally remark, that our extended examination of that paper has not been made because of its essential bearing upon the merits of the case of the complainant. It was to disabuse the record of what did not legally belong to it, and to correct misapprehensions which might arise unless its character and import had been legally shown. Give to it, however, the fullest credence, and it will be seen that it can have no effect upon the law of adulterine bastardy, upon which this case must be decided, which we are now to consider.

This brings us to the chief objection which was made in the argument, and most relied upon to defeat the recovery of the complainant. It is that her status of adulterine illegitimacy incapacitates her from taking as legatee under the olographic will of her father, though admitted to probate, as it has been, by the Supreme Court of Louisiana.

It is an averment of the defendant in his answer to the complainant's bill, but not in response to any allegation in it. It changes the attitude of the litigants from what it was in the case of Gaines *v.* Relf and Chew, in 12 Howard. Then Mrs. Gaines had the burden of proof to establish affirmatively the fact, that she was the forced heir of her father, and the donee of her mother, his widow. This court at that time did not think that had been satisfactorily done, and dismissed her suit, without affirming for or against the factum of marriage between her father and mother. Indeed, such a point could not have been made, or be supposed to have been intended to be decided by the court in the case then in hand, without expressly overruling its decision in 6th Howard, that there had

been a lawful marriage between Daniel Clark and Zulime Car-riere, her father and mother, and that Mrs. Gaines was their lawful child. To get rid of the force and effect of that decis-ion, the defendants, having only charged before that she was the offspring of an illicit intercourse between her father and mother, invoked the church papers of which we have spoken so much, in the hope of establishing from it that she was an adulterous bastard. And again, with the aid of that which is not evidence in the case, *and with much that is so,* they now rely to establish that charge. Mrs. Gaines meets the charge with new evidence, relying upon the old also, and with the declara-tion of her father in his last will, that "I do hereby acknowl-edge that my beloved Myra, who is now living in the family of Samuel B. Davis, is my legitimate and only daughter, and that I leave and bequeath unto her, the said Myra, all the estate, whether real or personal, of which I may die possessed, subject only to the payment of certain legacies, hereinafter named." And with this presentation of herself, of which she had never had the proof before, asked that the case might be judged according to the evidence *and the laws applicable to it.* What that proof is will be arrayed hereafter in its proper place. Now, we only remark that the burden of proof is upon the defendant, and that the law applicable to such a declara-tion in a will, concerning a child, requires that there shall be full proof to the contrary of it, and will not be satisfied with *semi plena probatio.*

But the law regulating the sufficiency of proof for the disaf-firmance of such a declaration in a will cannot be fully under-stood and appreciated, unless our recollection shall be revived of the differences made by the ecclesiastical law and that of Louisiana as to the kinds of illegitimacy, and the disabilities and privileges attending them. In fact and in law they differ. The rights and capacities of illegitimates depend upon the dis-tinctions being preserved.

If one be a bastard, from having been born, as the Code ex-presses it in article 27, of an illicit connection, though they cannot claim the rights of legitimate children, yet, if they have been duly acknowledged by their fathers and mothers, *leaving*

*no lawful children or descendants,* they, as natural children, will be called to the legal estate or succession of *the mother,* to the exclusion of her father and mother, and other ascendants and collaterals of lawful kindred. And in the case of their father's succession or estate, they may be called to the inheritance of it when he has acknowledged them, and has left no descendants, no ascendant, no collateral relations nor surviving wife, and to the exclusion only of the State. But though natural children, and known to be so, they can take by testament or will from their father, if born before their father's will were made. And here we have the reason, in the differences of their right of succession to their fathers and mothers, why Clark made his olographic will in favor of his legitimate daughter Myra; fearing from the claudestinity of his marriage, and other circumstances attending it, that her legitimacy would be denied, notwithstanding his habitual and daily acknowledgment of it, unless it was proclaimed and avowed in his will. They take or inherit by wills of their fathers, if born before the wills were made. As of a devise that B shall stand seized of land to the use of Jane, his daughter. This would be a good devise to her, if she were reputed to be so, though she were a bastard, and not so called in the will. Dyer, 323, pl. 29; S. C. Jenk, p. 239; 41 E., 3—13. But this does not extend to a bastard born after will made. Sid., 149; 39 E., 3—24; 3 Leon, 48. Rivers's case, 1 Atk., 410. Hardin *v.* Stardin, 2 Ves. Jun., 589. 2 Blood *v.* Edwards; Cro. Eliz., 509, 510. Coke Litt., 123, B. Ex parte Wallop, 4 Brown C. C., 90. Kinnel and Abbott, 4 Vesey, 502. ·

A bastard in *esse,* whether born or unborn, is competent to be a devisee or legatee of real or personal estate. The only question in such a case is, whether, when in *esse,* the bastard is sufficiently designated as the object of the bequest. Gordon *v.* Gordon, 1 Merivale, 141. Bayley *v.* Snelham, Sim. and Stu., 78. 2 Powel on Devises, by Jarman, p. 260. Co. Litt., 3—6, and note 1. Dyer, 313. Noy, 35. Park, 26. 3 Leon, 48—49. But we ought to mention in this connection whether a gift can be made to a bastard not procreated is *vexata questio.* The early authorities certainly lean to the negative. The

reason assigned is, "that the law does not favor such a generation, nor except that such shall be.". Bloodwell and Edwards, Cro. Eliz., 509. Co. Litt., 3—6.

So that we see by the foregoing authorities, had it been proved in this case, or in any of the cases which the complainant has brought for her rights in her father's estate, that she was the offspring of an illicit intercourse, which we affirm it never has been, she would now be in the condition, from her father's testamentary declaration of her legitimacy, to take as his universal legatee. And if the case was made to turn upon that now, the complainant would be entitled to a decree; but it does not.

It is said, as an adulterous bastard, produced by an unlawful connection between two persons, who at the time when the child was conceived were either of them or both connected by marriage with some other person, the complainant cannot take under the olographic will of her father, because the Code forbids it. The articles 217, 222, do forbid the legitimation or acknowledgment by their fathers and mothers of adulterine children. The article, 914, does say that in no case can adulterine children inherit the estates of their fathers and mothers— that is, as acknowledged natural children may do, by the articles 912 and 913 of the Code. And it is declared by the 1475 article of the Code, "that natural fathers and mothers can in no case dispose of property in favor of their adulterine or incestuous children, unless to the mere amount of what is necessary to their sustenance, or to procure them an occupation or possession by which to support themselves." This is the prohibition upon which the defendants rely to defeat the complainant.

The application of it, however, to the case in hand, was not as fully considered by the learned counsel for the defendant as it might have been. We will make it, with a decided Louisiana case for everything that shall be said, and by authorities for every general proposition cited, akin to the subject-matter.

The article containing the prohibition necessarily intends that the relation of the parties shall be such as it mentions, before it can have an effect upon either of them.

Now, we say, first, that the legal relations of adulterous bastardy do not arise in this case; for, independently of the declaration of the will, that the complainant is the legitimate child of Daniel Clark, this court having decided in 6th Howard that the marriage of Clark to Zulime was valid by reason of the invalidity of her previous marriage with Jerome Des Grange, that of course makes the complainant legitimate. But if it be assumed, as it was in the argument, that by the decision in 12 Howard, the marriage of Clark to Zulime was invalid on account of the validity of her marriage with Des Grange, then still Myra is legitimate *by the law*, as the offspring of a *putative marriage.*

The cases from the Louisiana Reports are conclusive. The articles in the old Code, 119, 120, are to this effect, that if both parents, or either of them, contracted the second marriage *in good faith, the issue of it will be legitimate.* So it was ruled in the case of Clendening *v.* Clendening, (3 New Series, 438.) The language of that case is, "that the plaintiff resists the claim on the succession of his father by a woman he married in the lifetime of his wife, the plaintiff's mother, and of the children, if born of that woman. The defendants contend that notwithstanding the plaintiff's father had a lawful wife at the time of his second marriage, that as the woman he last married was in good faith at the time of the marriage, and ever since, at least till after the birth of the last child she had by him, her marriage has its civil effects; and that she and her children, the present defendants, are entitled to all the advantages the law gives to a lawful wife and children. There seems to be no dispute on the question of law. The woman who was deceived by a man who represents himself single, and the children begot while the deception lasted, are bona fide wife and children, and as such are entitled to all the rights of a legitimate wife and issue." The plaintiff then urged, that four of the children were born after the good faith of the woman ceased, as she had been advised of the illegality of her marriage by a communication made to her that her husband had another wife living in Tennessee. The court, however, said the proof of this knowledge was insufficient to deprive herself

and her children of their rights, though one witness swore he communicated that fact to her.

The next case came up before the new court organized in Louisiana under the constitution of 1845. It is that of Patton *v.* the Cities of Philadelphia and New Orleans. 1 Ann., 100. The facts were, that in 1799 A. Morehouse married Abigail Townes in the State of New York, and had two children by her. He subsequently came to the Spanish colony of Louisiana, and gave out that he was a widower, and married Elenore Hook. In the act of marriage, he declared himself the widower of Abigail Townes. By the second wife he had children, and both wives survived him. It was said, "the decision of the late Supreme Court in the case of Clendening *v.* Clendening et al., 3 M. N. S., 438, in relation to the good faith of the second wife, is a correct application of the Spanish law, which regulated the subject-matter at the time of the marriage of the plaintiff's ancestor. By the law, 1 title, 13, part 4, it is ordained, that if, after both parties know with certainty the existence of the impediment to the marriage, they beget children, these children will not be legitimate; yet if, during the existence of such impediment, and while *one or both of them* was ignorant of it, they should be accused before the judges of Holy Church, and before the impediment, as proved in the sentence pronounced, they should have children, those begotten during the existence of the doubt will all be legitimate. We agree with the plaintiff's counsel, that the second wife, and all the children conceived during her good faith, have all the rights which a lawful marriage gives." In this case, also, it was said that the second wife was informed of the existence of her husband's first wife; "but the court answered, the evidence establishes nothing more than the existence of a doubt."

We now give the case of Olive Abston et al. *v.* Rebecca Abston et al., decided in 1860, by the Supreme Court of Louisiana. Its ruling is coincident with the two previous cases cited, upon a statement of facts concurring with them, but more particular in detail.

Olive Abston sued to have herself recognised as the lawful

surviving wife of John Abston, deceased, late of the parish of Carroll, claiming she was entitled to a portion of the property of his succession. Her son, John N. Abston, the issue of her marriage with John Abston, deceased, joined in the action, for the purpose of having himself recognised as the legitimate son and lawful heir to the estate of his deceased father. John N. Abston is the exact case of Mrs. Gaines. The suit is against Rebecca Wright, the third wife of John Abston, deceased, and *the administrator of his succession or estate.* He intervened in his capacity of tutor of Nancy Nix Abston, the minor child of the defendant, the issue of her marriage with the deceased, claiming in behalf of the minor the rights of legitimate and forced heir in the succession of John Abston, her father. Rebecca Wright pleads in general denial, and avers that she was lawfully married to John Abston, deceased, in Warren county, in the State of Mississippi, and that if the plaintiff's alleged prior marriage was ever consecrated, it was unknown to her, and to all other persons residing in the State of Mississippi. She filed, also, a supplemental answer, averring that her husband, John Abston, had made in the State of Mississippi his will, leaving to her his whole estate, after the payment of his debts, and that the will had been admitted to probate in the parish of Carroll, in Louisiana.

The facts of the case were these: John Abston married with Olive Hart, his first wife, and plaintiff in this suit, in the State of Alabama. John N. Abston, the co-plaintiff in the suit, and other children, were the issue of that marriage. John Abston abandoned his family in the State of Alabama without having been divorced, *a vinculo matrimonii,* from his first wife, contracted a second marriage with one Susan Bell, and she died. After her death, and being still undivorced from his first wife, he intermarried in Mississippi with Rebecca Wright. In a short time after this last marriage he removed from Mississippi into Carroll county, in the State of Louisiana, where he acquired a new domicil, and where he died, in which was situated the whole property of his succession, moveable and immoveable, at the time of his death.

This narrative, and the relations as they have been given

of the parties to the suit, raised two questions, which it became necessary for the court to decide before it gave its opinion upon the question of the legitimacy of the two sets of children of John Abston, the bigamist, and father of them, and the rights of his two wives in his estate: First, as to the effect of the probate of the will, it being contended, as that had been done by a court of competent jurisdiction, that it could not be questioned collaterally, nor its validity be inquired into in the suit. The court declared that the decree of a probate court ordering a will to be executed does not amount to a judgment binding on those who are not concerned in it, and that when the will is offered as the title in virtue of which property is claimed or withheld, that its validity may be inquired into. Sophie *v.* Duplessies, 2 Annual, 724; Succession of Dupuy, 4 Annual, 570. The other question raised was, whether the rights of the parties in the suit should be determined by the law of Mississippi, where the marriage of the defendant and the deceased had been contracted, or by the law of Louisiana, where John Abston had his domicil at the time of his death, where his succession was opened, and where all his property was situated. The answer to that question was, that the laws of Louisiana which regulate the right of succession make no distinction between persons who have contracted marriage in or out of the State, nor the issue of such marriages, whether born in or out of the State. If they have the qualities required by the law in matters of inheritance, they will be recognised as legal heirs without regard to the places of marriage or birth.

The court, then, with a proper regard to the fact that the will which had been made by John Abston *was invalid on account of its not having been attested by three witnesses, and that the succession was an intestacy,* determines that it could not be regulated by the law of Mississippi, as the plaintiff contended it should be, the basis of which is the common law, but that it must be by the law of Louisiana. We prefer to cite its own language as to the similitude and the differences between them: "The prior marriage of the deceased with the plaintiff, which remained undissolved. was a legal disability under the

common law, which made the marriage with the defendant, Rebecca Wright, not merely voidable, but void *ab initio,* and made their issue illegitimate, and incapable of succeeding by inheritance to the estate of any one. By the law of this State the disability of a prior marriage undissolved also renders the second marriage null and void; *but the legal consequences of a marriage void* ab initio *under our law are very different from those under the common law.* The Civil Code declares, that "the marriage which has been null nevertheless has its civil effects in respect to the parties and their children, *if it has been contracted in good faith. If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor, and in favor of the children born of the marriage."* "In two cases, somewhat similar to the present, it has been held that each wife was entitled at the death of the husband to one-half; as the community property, after the payment of debts; and this rule will govern our decision in this case." Patton *v.* Philadelphia, 1 Annual, 98; Hubbett *v.* Inksleon, 7 Annual, 25. The mandate of the court was accordingly given, with this further decree, that John N. Abston, the co-plaintiff, and that *Nancy Nix Abston, the minor, represented by the intervenor,* are entitled as heirs-at-law to the separate property or estate of their deceased father, John Abston, and the costs of the appeal were directed to be paid, one-half by the plaintiff, Oliver Abston, and the other half by Rebecca Wright, the defendant.

But in further confirmation of what has been the Spanish law, and, of course, that of Louisiana, in legitimating the children of those who marry in good faith, believing upon good ground that there was not a precedent marriage to prevent it, we cite from the Novissima Recopilacion, 5 vol., 425, N. Ley., 10, what was said in the Council allowed to be held by Charles 3, King of Spain, in the year 1777, for the purpose of giving to the Inquisitor General a better understanding than he professed to have concerning the King's royal ordinance of 1770, concerning the jurisdiction of the holy office in bigamy and polygamous cases generally.

The result of that Council, and so recognised by the King, was: "That by the act of marrying a second time, whilst the

first 'wife was alive, the person who does so violates the faith due to the marriage contract; that he deceives the second wife and wrongs the first; inverts the order of succession and of the legitimacy established by the laws, inasmuch as his fraud makes the children of the second marriage, *though truly adulterine, legitimate, and capable to inherit from their parents on account of the good faith of their mother in contracting that marriage.*"

To the same effect is the Code Napoleon. C. Cer., art. 201, 202. The law of France was so before the Code. Pothier, Contrat du Mariage, vol. 3, pp. 172, 107; Toullier, tome 1, 598; Marcadi Explication du Code, tome 1, 520; Law of Spain, Partida, 4 Lex, tit. 13, v. 1; Dalton's Dic., tome 2, 372; Tit. Mariage, 372.

Thus we see, though a child may be adulterine in fact, it may be legitimate for all the purposes of inheriting from its parents, if one or either of them intermarried in good faith..

Such is the law for others in Louisiana, and it must be administered accordingly for the complainant, if she stands in the position, by the evidence which the law requires and has determined to be sufficient to establish a marriage *in good faith* between her father and mother, *or as to either of them,* to entitle her to inherit from either or both of them *as legitimate by the law.*

On such a question good faith is first to be presumed. Marcadi Explication, tom. 1, pp. 522, 698. As to what constitutes good faith, it is adjudged that to marry a second time, supposing the previous marriage invalid, is one of the cases of good faith. Dalton's Dic., tom. 2, p. 371; Tit. Spain, No. 578. The two last citations have been given to show the inaccuracy of the conclusion of the learned counsel of defendant, that if the invalidity of the marriage between Des Grange and the complainant's mother was not proved, that she was necessarily an adulterine illegitimate.

She was heir-at-law if procreated by Clark **in** good faith, or if conceived by her mother in good faith—that is, she supposing her capacity to become the wife of the former.

Nor was a sentence of the nullity of the marriage between Des Grange and the complainant's mother necessary to pro-

tect the legitimacy of the offspring. Marcadi Explication, tome 1, p. 495; Ibid, p. 519; 2 Phillemore's Reports, 19; Shelford on Marriage, Law Library, vol. 31, p. 275.

The good faith of Clark and Zulime is proved by the evidence of Madame Despau (Old Rec., 580) and Madame Calliant, (Old Rec., 309,) and by the contemporaneous facts relating to the marriage, as well as by the testimony of Caviliere (Old Rec., 546) as to the bigamy of Des Grange, by the testimony of Bellechasse, by that of Madame Benguerel. Old Rec., p. 349. The good faith of Clark in marrying is proved by his own declarations in the last years of his life. By Bellechasse's testimony, Probate Record, 173, Boisfontaine, Ibid, 162, Mrs. Smyth's, Ibid, 152. Again: the good faith of the marriage is proved by the authentic declaration of Clark in his will that the complainant was his legitimate daughter and only child. See, also, the opinion of the Supreme Court of Louisiana, Charles Succession, 11 Annual Reports.

But we now say, if we are to consider the question of adulterine bastardy to be properly before us in this case, it cannot affect the rights of the complainant under the will of Clark of 1813. If the complainant, by reason of the matrimonial character of her mother, shall be deemed adulterine on that side, she is not so on the side of her father, he having been as a single man free to marry; and if he did marry in good faith, she is not incapacitated, as respects him, to be, under his will, his universal legatee. Journal Du Palais, vol. 60, p. 45, January 7, 1852.

There is no pretence that Clark was incapable to contract marriage; and it matters not whether, as to the mother of the complainant, any impediment existed under the Spanish law; the complainant stands as the declared issue of her father by a woman to whom he supposed himself lawfully married. Not only the bill itself, but the evidence upon which it is established, shows that Daniel Clark had no other legitimate issue. No one exists who has any right to contest his acknowledgment of the legitimacy of his child, or to set up the adulterous source of her origin. See C. N., art. 335, 2 Marcadi, pp. 51, 31, 52, Nos. 60, 61, 62; Journal du Palais, vol. 60, p. 45; Jo-

bert et al. *v.* Pitot ex'ors, 4 Annual, 305; Judge Foulhouse's Opin., 57, 58; 2 Toulliers, 960.

The testamentary recognition of a child as legitimate is of the highest legal authority. All presumptions are to be taken in favor of such a declaration. Matthews on Pres. Ev., pp. 284, 286; Gaines *v.* Chew, 12 Howard, 593; Miller *v.* Andrews, 2 Louisiana Annual, 767; Jarman on Wills, vol. 1, p. 188; 5th Phillip's Note, 284, 287. And authorities cited. 1 Greenl. Ev., 134. And we now cite, in confirmation of all that has been said upon this point, the 117 Nouvelle of Justinian. It gives the rule of evidence in such cases, and it prevails in every ecclesiastical court in Europe, where the Roman law is the basis of its jurisprudence, in respect to the legitimacy of persons. It is also, in cases of that kind, the law of Louisiana.

We give it in the original Latin: "Ad hoc autem et illud sancire perspeximus, ut si quis filium aut filiam habens de libera muliere cum qua nuptiæ consistere possunt, dicat in instrumento, sive publica, sive manu conscripto et habente subscriptionem trium testium fide dignorum, sive in testamento, sive in gestis monumentorum, hunc aut hanc filium suum esse, *et non adjecerit naturalem, hujusmodi filios, esse legitimos, et nullam aliam probationem ab iis quæri,* sed omni frui eos ure quod legitimis filii nostræ conferunt leges." Translation: "We have determined to ordain, that if any one having a son or daughter of a free woman, with whom he might have been married, shall say in a written act, either before a public officer or under his own hand, sustained by three credible witnesses, *or in his last will,* or in public acts, that this son or this daughter is his child, and that he does not call them natural children, they shall be *reputed legitimate,* and no other proof shall be demanded of them, and they shall enjoy the rights of legitimate children." This Nouvelle has been the subject of much criticism and learned interpretation by the most distinguished civilians. By no one more so than the Chancellor d'Anguesseau, in his declaration or ordinance of 1736, which had for its object, as he himself says, to explain and affirm the proofs of the legal condition of men. The declaration consists of forty-two articles. Several of them relate to the form in which baptismal

acts ought to be registered to give verity to legitimates; but whether they are so or not, this ordinance of Justinian secures to children legitimacy, if they shall be placed by their fathers or mothers within its predicament. And we may add, that the interpretation of it by all who have been skilled in the civil law is, that it attaches legitimacy to the son or daughter of a man and woman who are both free, but that it does not demand that the word legitimate should be applied to them to make them so. On the contrary, the Nouvelle means that if the child is not called a natural child, he is of right to be reputed legitimate, and the commentator's remark is: "Mark well, that this is not a Roman law made when paganism reigned in Rome, but a law made by a Christian Emperor." Merlin Repertoire de Jurisprudence, 17 vol.; Tit. Legitime, secs. 1 and 11, pp. 348, 349; Ed. Bruxelles, 1827; Question. d'Etat; On la previe testimoniale ne ful point admise, tome 8; Causes Celebres Filiation Reclamée, Sans acte de baptime, sans une Veritable Possession d'Etat, sur le fondement de plusieurs forte consectures; tome 19, Causes Celebres, 204.

Such as we have stated it to be is the law relating to the children of a *nutative* marriage, though it be adulterine in fact, if it was contracted in good faith by the parties, or by either of them. Their children are legitimated to inherit from their parents, either in a case of intestacy or to take by testament. In the latter, a declaration by either father or mother that they are their children, without the addition that they are natural children, will make them legitimate, and no other proof can be demanded of them to enable them to enjoy all the rights of legitimate children. But the case in hand is even stronger than that; for here the father in his will "acknowledges his beloved Myra to be his legitimate and only daughter," and makes her the universal legatee of his estate after the payment of certain legacies.

But the defendants aver that the connection between her father and mother was adulterine, even though they may have been married, and on that account that she is barred from taking as legatee under her father's will

We will now give the proofs upon which they rely to sub-

stantiate their allegation, in connection with the voluntary rebutting testimony of the complainant, as we find it in the record.

The paper from the Cathedral church in New Orleans is first invoked by the defendants. Now, though that paper has been shown to be an unauthorized attempt by a canonical prebendary, without jurisdiction of any kind in such a matter, upon a public report, to try Des Grange for bigamy, for having three wives at the same time, and to make him answer by imprisonment, whether such an irresponsible accusation was true or not true, the defendants in our consideration of their averment shall have the full benefit of that paper as evidence, though we have declared it to be inadmissible as such.

Des Grange, it appears from the paper, was put in the public prison and kept there until the canon, Hassett, after having examined several witnesses, decreed: That not being able to prove the public report, he directed the proceeding to be suspended, to be resumed thereafter if it should become necessary, and that Des Grange should be set at large, on condition that he paid the costs. This he did, and fled from New Orleans, without ever having again any conjugal relations with the mother of the complainant, though as it will directly appear from the paper that he was indebted to her for his enlargement from the canon's usurped authority. Nor did Des Grange reappear in New Orleans until after the cession of Louisiana to the United States.

In the course of the proceedings against Des Grange, both himself and the complainant's mother were examined as witnesses. Both of them reply to questions concerning his bigamy in respect to his marriage in 1794 with her; acknowledge that they were aware of the report prevailing against him in that regard; and she says that about a year since (in 1801) it was stated in the city that her husband had been married at the North, and wishing to ascertain whether it was true or not, that she had gone to Philadelphia and New York, where she used every exertion to find out the truth of the report, and that she learned only that he had courted a woman, whose father not consenting to the match it did not take place, and

she married another man shortly afterwards; and she adds, that she had recently heard that her husband was married to three women, but she did not believe it, nor had she any doubt about the matter which rendered her unquiet or unhappy. All of this Des Grange confirms; for being asked why his wife, Maria Julia Carriere, went to the North last year, he answers: "That the principal reason was, that a report had been circulated in this city that he was married to another woman; she wished to ascertain whether it was true, and she went.

. Thus the defendants, by the introduction of the paper from the Cathedral, show the existence and currency of the report of Des Grange's guilt of bigamy in marrying the mother of the complainant, and the aggravation of it in the public mind by the prosecution of him, and from the canon not having dismissed it altogether, but having retained it for further inquiry. Upon his enlargement, as has been proved by unimpeachable testimony, Des Grange fled.

Now, in this connection, it is appropriate to state the evidence which the law will receive and pronounce to be sufficient to determine that he did commit bigamy when he married the mother of the complainant. It so happens, excluding all admission of it to the family of the mother of the complainant, the fact is proved by a witness, the truthfulness of whose testimony has not been assailed, and could not have been.

Madame Benguerel has no connection with the family of the complainant; and her standing and character were such that the defendants could not impeach her credit by even an insinuation against either; but she was subjected to their cross-interrogation. It brought out neither difference nor contradiction of herself, nor was there anything in the way in which she gave her testimony to subject her to any suspicion of friendship to the complainant, or of any want of memory or uncertainty in her narrative.

Madame Benguerel says: "My husband and myself were very intimate with Des Grange, and when we reproached him for his baseness in imposing himself upon Zulime, he endeavored to excuse himself by saying, that at the time he married her he had abandoned his lawful wife, and never intended to

see, her again." In answer to a cross-interrogatory put upon the point, she says: "I am not related to the defendants, nor with either of them, nor am I with the mother of Myra; nor am I at all interested in this suit." She adds: "It will be seen by my answers how I know the facts; I was well acquainted with Des Grange, and I know the lawful wife of Des Grange, who he married before imposing himself in marriage upon Zulime."

The paper then discloses the following facts: That Des Grange was notoriously charged with bigamy in marrying Zulime; that she left New Orleans "for the North" in 1801 to get proof of it; that he says that her principal reason for going was for that purpose; that he was prosecuted for bigamy by the canon in 1802, and was temporarily released from prison after Zulime had sworn that she did not believe the report about him. It is in proof, also, that he then fled from New Orleans, and did not return to it until the year 1805. Her interference or testimony before the canon negatives every suspicion that she had any agency in instigating the prosecution against him. His own oath upon the occasion confirms it, for he speaks of his wife being satisfied with his innocence, and there is not a word in the paper nor in any of the evidence to show that her friends had provoked or abetted in any way the public accusation of his bigamy. Nor is Clark, the father of the complainant, at all associated with that procedure. Indeed, he was in Europe at that time. With all these facts and obvious inferences from them, taken in connection with the testimony of Madame Benguerel, the only question concerning the bigamy of Des Grange in marrying the mother of the complainant when he did, is whether the law determines the evidence to be sufficient in a civil suit to establish the fact.

We think that the law requires us to pronounce that it is sufficient.

A charge of bigamy in a criminal prosecution cannot be proved by any reputation of marriage. There must be proof of actual marriage before the accused can be convicted. But in a civil suit the confession of a bigamist will be sufficient,

when made under circumstances from which no objection to it as a confession can be implied. There are none such in this case. The first legal consequence of such a state of the evidence is, that it released the mother of the complainant from all conjugal obligations with Des Grange, making her free to contract marriage with any other man who was free to intermarry with her. But that conclusion is not the purpose for which we have used, as the defendant wishes it, what the church paper discloses. The object has been to show that the defendants have introduced that paper in support of the charge of adulterine bastardy, when in fact it discloses a condition of things from which it may well be inferred that both the father and mother of Mrs. Gaines intermarried in good faith. It is far short of the evidence in the record to prove that they did so, which will be seen presently. Then the next testimony which the defendants rely upon to aid in proving the adulterine status of the complainant is that of Daniel W. Coxe, the friend and co-partner in business with Daniel Clark. His testimony was originally taken in a previous case to invalidate the marriage between Clark and the mother of the complainant. In 12 Howard, as it was in this case, it was associated with the church paper to sustain the objection we are now considering. In the argument, it was said that the two were sufficient to prove it. But take the testimony of Mr. Coxe as a whole, or in its particulars, and no part of it has the slightest bearing upon the canon's prosecution of Des Grange, or upon the objection that the complainant was the offspring of an adulterous intercourse. Mr. Coxe begins with the history of Caroline Barnes, giving an account of the preparations which he had made at the solicitation of Daniel Clark for the confinement of her mother, and then states it to be his belief that Clark had never married her. Beyond this, in regard to the marriage, he does not speak, except in his offers to the success of his effort to dissuade her from attempting to prove it, and that he did not believe that Daniel Clark was in Philadelphia in the year 1803, when it is alleged that he married there the mother of the complainant. Many other circumstances are narrated by Mr. Coxe in connection with the affairs of Mr

Clark, and of his acknowledgment of Caroline Barnes as his illegitimate child. But after the closest examination of them in connection with the point of adulterous bastardy, and that Clark and Zulime, after the birth of Caroline, were married in good faith, there is not a word in Coxe's testimony to impeach the fact of marriage, or the fidelity of the parties in entering into it.

The defendant also gave in evidence a letter written by Bellechasse, from Matanzas, to Coxe, in reply to one from the latter. Coxe had written to Bellechasse at the instigation of Mr. Relf, requiring him to dispose of fifty-one lots in favor of Caroline Barnes, to the exclusion of the complainant, for whom they were confided by Clark to him for her benefit. This Bellechasse refused to do. He then states what had previously passed between Relf and himself concerning these lots. He had before given to Relf his renunciation of any ownership of them, with directions to dispose of them for Myra, stating what had passed between himself and Clark upon the subject, as he has related it in his testimony. Probate Record, pages 173 to 182, inclusive, answer to 13th interrogatory. This letter does not relate in any way to the marriage between Clark and the complainant's mother, or to their alleged adulterous intercourse. It, however, confirms the honorable character of Bellechasse, and strengthens all that he had said of Clark's declarations to him of the legitimacy of his daughter Myra, and of his intentions to make her the heiress of his estate. This letter seems to us to have been introduced into this case by the defendants, with some expectation that it might serve to make Bellechasse's testimony equivocal, and also to associate both Myra and Caroline as the adulterine offspring of Clark and Zulime. The attempt, in our view, is a failure as to both. The complainant's status depends upon the evidence in this case. That of Caroline Barnes, notwithstanding the declarations of Coxe that she is the natural child of Clark by Zulime, must be determined by the law as to what were the relations between her mother and Des Grange when she was conceived and born. The witness, Madame Despau, says that she was at the birth of Caroline, and that it took place in 1801. Mr.

Coxe says, to the best of his belief, that she was born in the year 1802, but without any of those attendant circumstances which give even a coloring to the correctness of his chronol ogy as to the event of which he was speaking, and with one proceeding from himself, which shows how little reliance can be put upon the accuracy of his memory, either as to the time when he says Mrs. Des Grange presented to him Clark's letter to have her taken care of in her confinement, as she was with child by him, or as to the time of the birth of Caroline, or as to Clark's visits to Philadelphia immediately preceding his departure for Europe in the year 1802. In Mr. Coxe's second examination, he states it had been disclosed to him by his correspondence with Clark that the latter had been in Philadelphia from late in 1801 to the last of April, 1802, all of which time Zulime was there; that it was in April that Clark returned to New Orleans, and afterwards that he had revisited. Philadelphia in July, 1802, on his way to Europe; thus confirming the statement of Madame Despau in those particulars. In the absence of all contrary proof, either by circumstance or deposition, the declaration of Madame Despau as to the time when Caroline Barnes was born must be received to establish that fact. And that being in the year 1801, however much it may be suspected that she was the child of Clark, and even that he supposed her to be so, she must be considered in law to be the child of Des Grange, the gestation of her mother and the birth of the child being within the time before any interruption had taken place of their conjugal relations. That is proved by evidence introduced into the case by the defendants. The first is the power of attorney of the 26th of March, 1801, given by Mesdames Caillavet, Lasabe, and Despau, authorizing Des Grange, their brother-in-law, to proceed to Bordeaux, in France, to recover property of which they were co-heiresses of their father and mother. Next, by a general power of attorney, which Des Grange at the same time gave to Zulime to act for him in all his affairs during his absence. She did so in several particulars, styling herself the legitimate wife and general attorney of Don Geronimo Des Grange. Des Grange accepted the power given to him, sailed for France in

April, and on the 1st July, 1801, wrote from Bordeaux to Clark to aid his wife with his advice, should she be embarrassed in any respect, and expressed his uneasiness that he had not yet heard from her; saying, also, that he was then engaged in a "lawsuit for the purpose of recovering an estate belonging to my wife and family." Now, under such a chronology of circumstances and of conjugal amity, we need not say that as access between man and wife is always presumed until otherwise plainly proved, and that nothing is allowed to impugn the legitimacy of a child short of proof by facts showing it to be impossible that the husband could have been the father of it, the law, then, establishes the relation between Des Grange and Caroline as having been that of father and legitimate child, and that she was not the offspring of an adulterous commerce between Clark and Zulime; though Coxe says she was, and reaffirmed substantially in his letter to Bellechasse, as we gather from his answer in his refusal to turn over property to Caroline which was received by him from her father for Mrs. Gaines. See letter in page 896 of Record of Gaines *v.* Hennen.

The defendants also gave in evidence an authenticated record from the county court of New Orleans. It was introduced by them, and declared by them, in their answers to the complainant's bill, to be a petition by her mother, Zulime Nee Carriere, wife of the said Des Grange, to a competent judicial tribunal in New Orleans, praying for a divorce and dissolution of the bonds of matrimony existing between her and Des Grange, which was subsequently decreed after the birth of the complainant. But they now urge and declare that such record and decree prove nothing in the case. In our opinion it proves much, though differently from what it was introduced for. Their counsel now says, that the record is deficient in the petition, and therefore that it does not appear that its object was the annulment of the marriage between Zulime and Des Grange on account of his bigamy. The petition is wanting; and why, has not been satisfactorily shown by the defendants. They knew it to be wanting when they introduced the record of evidence, and on that account cannot now repu-

diate it for what it contains, because that is against the purpose for which it was introduced. It shows that a petition was filed; that a curator was appointed for Des Grange; that he was summoned to answer for Des Grange; that he appeared and demurred to the jurisdiction of the court *in cases of divorce*, and on that account that the court could not pronounce a judgment therein, and that the damages prayed for in the petition could not be assessed until after the court had rendered judgment touching the validity of the marriage. There was a joinder in demurrer, which, however, was withdrawn, and the curator filed the general issue. The docket entries in the suit, kept by the clerk, are in conformity with the act of April 10th, 1805, section 11. They are as follows: Petition filed June 24, 1806. Debt or damages, $100. Plea filed 1st July, 1806. Answer filed July 24, 1806. Set for trial 24th July. The witnesses are stated, and the costs given. And then follows judgment for plaintiff, damages $100, July 24, 1806. Now, this extract of so many particulars makes out as well as it could be done the purpose of the petition, and establishes consistently, as it is required to be done, by the rules of evidence for such a case, that the marriage between Jerome Des Grange and Zulime, or, as otherwise named, Marie Julia Nee Carriere, was thereby declared null and void. But the defendant's counsel says, that the record is inoperative for any purpose, inasmuch as it was a proceeding at the instance of Zulime in her maiden name, three years after her alleged marriage with Clark. It is forgotten that a judicial invalidation of marriage at any time for the bigamy of a party to it relates back to the time of the marriage, and places the deceived in a free condition to marry again, or to do any other act as an unmarried woman, without any sentence of the nullity of the marriage. The evidence, too, shows that the procedure by Zulime against Des Grange originated in her anxiety to place herself in that condition in respect to her marriage with Clark, which he had enjoined upon her to keep secret until a sentence of the nullity of her marriage with Des Grange had been obtained. She could not, under such circumstances, use Clark's name in such a suit; she could not

have sued in Des Grange's when disclaiming the validity of her marriage with him; and therefore her counsel in filing her petition used her maiden name, as it was proper and professional in them to do. One thing is certain, that the record from the county court of New Orleans does not in any way sustain the charge against this complainant of adulterine bastardy, but adds another circumstance to the many which exist in proof of the marriage between her father and mother, and of the good faith with which they entered into it.

To confirm what has just been said, we will now cite the evidences of it:

"Madame Despau testifies that she was at the marriage of Zulime and Clark in 1802 or 1803; that it took place in Philadelphia, and the ceremony was performed by a Catholic priest, in the presence of other witnesses as well as of herself. She states that she was present when her sister gave birth to Mrs. Gaines; that Clark claimed and acknowledged her to be his child, and that she was born in 1806. That the circumstances of her marriage with Daniel Clark were these: Several years after her marriage with Des Grange, she heard he had a living wife. Our family charged him with the crime of bigamy in marrying Zulime. He at first denied it, but afterward admitted it, and fled from the country. These circumstances became public, and Mr. Clark made proposals of marriage to my sister, with the knowledge of all our family." The witness then continues her narrative, that it was considered essential before the marriage should take place that proof should be obtained from the Catholic church in New York of Des Grange's bigamy, it being there that his prior marriage had taken place. They went there; found that the registry of marriages had been destroyed. Clark followed them, and having heard that a Mr. Gardette in Philadelphia had been one of the witnesses of the prior marriage of Des Grange, and he told them that he had been present at the prior marriage of Des Grange; that he knew him and his wife; that the wife had sailed for France. Clark then said, you have no reason any longer to refuse to marry me; it will be necessary, however, to keep our marriage secret until I have obtained judicial proof.

of the nullity of your marriage with Des Grange. They were then married.

Such judicial proof was subsequently obtained, as has already been shown. Another witness, Madame Caillavet, confirms the statement that Clark made proposals of marriage for Zulime to her family, after her withdrawal from Des Grange, on account of her having heard that he was the husband of another woman then alive. She also swears that Clark admitted the marriage to her, and that so did Zulime. Clark also made an acknowledgment of it to other witnesses, with simultaneous declarations to them of the legitimacy of Myra; and his paternal treatment of her from her birth to his death impressed them with the full belief of the fact and of the sincerity of the purposes for which he made such declarations. Mrs. Harper, who nursed Myra, not as a hireling, but as the friend of Clark, says that he made to her at different times declarations of the child's legitimacy and of his marriage with her mother. He admitted it, also, to Boisfontaine, and added, that he would have avowed the marriage but for her subsequent marriage to Gardette. Pressed upon by such proofs, every effort was made by the most searching and repeated cross-examination to lessen the force of them without success. Failing in this, a direct attempt was made to discredit their veracity by an impeachment of their characters. It was a signal failure. Forty years of their lives were canvassed to bring upon them some reproach. The proofs to the contrary were decisive. They, too, had had their misfortunes; but their lives had been passed in the different places where they had lived, not only without censure, but altogether free from suspicion. Their testimony was also put in comparison with that of Mr. Coxe. They do differ in immaterial circumstances, but in nothing concerning the marriage between Clark and Zulime. All that Coxe had been able to say about that was, that he did not believe it. That conclusion, too, he came to by inferences from his own narrative concerning the time of the birth of Caroline Barnes; that he withdrew afterwards, as to the time of its occurrence, and also as to his declaration, that Clark had not been in Philadelphia in the year 1801, extending his sojourn there for more than

four months, whilst Zulime and her aunt were in search of proofs of the bigamy of Des Grange. The evidence also shows that Clark aided their inquiries for that purpose. Besides the want of memory of Mr. Coxe, his narrative shows so strong a bias against the marriage that we must receive it with many grains of allowance. After Zulime had obtained a sentence of the nullity of her marriage with Des Grange, she went to Philadelphia to learn the truth of reports which were in circulation concerning the fidelity of Clark to herself. She had an interview with Coxe; told him her purpose, and her intention to proclaim her marriage with Clark, unless she became satisfied upon that subject. He told her that she could not prove the marriage, and afterwards advised her to take counsel of a lawyer. He, of course, dissuaded her from any attempt to do so. At the same time Coxe aggravated her distress and hopelessness by telling her that Clark was then engaged to marry a lady of distinction in Maryland, which, whether true in the particulars of his narrative of it, or as a general report, there is no proof in this record; but it served his purpose in disuniting Zulime and Clark forever. Clark was then in the height of his popularity and distinction in the Congress of the United States. His friend sheltered him from the disclosure. Mrs. Harper, as a witness to Clark's admission to her repeatedly of the marriage, was cross-examined severely, but without any effect, to diminish the weight of her testimony in chief. Bellechasse and Boisfontaine, in their subsequent examinations, adhered to what they had at first sworn, and their characters forbade even a suspicion of its not being true.

Failing in every attempt to lessen the proof of the marriage, it was suggested that all of these witnesses were in combination to establish it by perjury. The defendant's counsel had himself extracted from their answers that they had no interest of any kind in the result of the suit. They are protected by the rules of evidence from any such imputation. There was no foundation for it.

The marriage, then, having been proved, the only point remaining is, whether it was contracted in good faith by the parties to it. We see no cause for thinking that it was not

entered into in good faith. Supposing it, however, not to have been so by Zulime, on account of her not having sincerely believed in the invalidity of her marriage with Des Grange, that could not take away the complainant's right to inherit her father's estate under his olographic will of 1813, if it has not been fully proved, as the rules of evidence in such cases require it to be done, that he did not marry in good faith. The doubts which may be indulged in respect to Zulime's sincerity cannot apply to him. He was an unmarried man, never had been married, when he united himself to Zulime, and the weight of testimony in the case is, that he did marry her in good faith. His conduct to his child from her birth to his death, his frequent declarations of his marriage to her mother, and of her legitimacy, and his avowal of it in his last will, are conclusive of his having married in good faith. The law applicable to such cases requires us to say so.

We have not thought it necessary to give all the evidence in this case in detail, but have accurately done so as to all of it bearing in any way upon the points in controversy, and especially as to that having any connection with the charge of adulterine bastardy. Those who may have any curiosity to read the testimony in full will find it in what is called the Probate Record; also in the cases as they are reported in 6 and 12 Howard, particularly in the old record of the last case.

Our judgment is, that by the law of Louisiana Mrs. Gaines is entitled to a legal filiation as the child of Daniel Clark and Marie Julia Carriere, begotten in lawful wedlock; that she was made by her father in his last will, his universal legatee; and that the Civil Code of Louisiana, and the decisions and judgments given upon the same by the Supreme Court of that State, entitle her to her father's succession, subject to the payment of legacies mentioned in the record. We shall direct a mandate to be issued accordingly, with a reversal of the decree of the court below, and directing such a decree to be made by that court in the premises as it ought to have done. Thus, after a litigation of thirty years, has this court adjudicated the principles applicable to her rights in her father's estate. They are now finally settled.

When hereafter some distinguished American lawyer shall retire from his practice to write the history of his country's jurisprudence, this case will be registered by him as the most remarkable in the records of its courts.

### DECREE OF THE COURT.

This appeal having been heard by this court upon the transcript of the record from the Circuit Court of the United States for the eastern district of Louisiana, and upon the arguments of counsel, as well for the appellant as for the appellees, this court, upon consideration of the premises, doth now here adjudge, order, and decree, that the decree of the said Circuit Court be and the same is hereby reversed, with costs, and that such other decree in the premises be passed as is hereinafter ordered and decreed.

And this court, thereupon proceeding to pass such decree in this cause as the said Circuit Court ought to have passed, doth now here order, adjudge, and decree that it be adjudged and decreed, and is hereby adjudged and decreed upon the evidence in this cause, that Myra Clark Gaines, complainant in the same, is the only legitimate child of Daniel Clark in the said bill and proceedings mentioned, and as such was exclusively invested with the character of such legitimate child, and entitled to all the rights of the same; and that under and by virtue of the last will and testament of the said Daniel Clark, the said Myra Clark Gaines is the universal legatee of the said Daniel Clark, and as such entitled to all the estate, whether real or personal, of which he, the said Daniel Clark, died possessed, subject only to the payment of certain legacies therein named.

And this court doth further order, adjudge, and decree, that all property described and claimed by the defendant, Duncan N. Hennen, in his answer and exhibits thereto annexed, is part and parcel of the property composing the succession of the said Daniel Clark, to wit: the same which Richard Relf and Beverly Chew, under pretended authority of testamentary executors of the said Daniel Clark and of attorneys in fact of Mary Clark, by act of sale, dated December 28, 1820, conveyed to Azelic Lavigne; which the said Azelic Lavigne, by act

of sale of the 29th of February, 1836, conveyed to J. Hiddle-ston, and which the said J. Hiddleston, by act of the 27th of May, 1836, conveyed to the New Orleans and Carrolton Railroad Company, and which the said company, by act of sale of the 13th of May, 1844, conveyed to the said Duncan N. Hennen, the defendant in this cause; that the said Richard Relf and Beverly Chew, at the time and times when, under the pretended authority aforesaid, they caused the property so described and claimed by the defendant, Hennen, to be set up and sold by public auction on the 19th day of December, 1820, and when they executed their act of sale aforesaid of the 28th of December, 1820, to the said Azelic Lavigue, had no legal right or authority whatever so to sell and dispose of the same, or in any manner to alienate the same; that the said sale at auction, and the said act of sale to Azelic Lavigne in confirmation thereof, were wholly unauthorized and illegal, and are utterly null and void; and that the defendant, Hennen, at the time when he purchased the property so described and claimed by him as aforesaid, was bound to take notice of the circumstances which rendered the actings and doings of the said Beverly Chew and Richard Relf in the premises illegal, null, and void; and that he, the said Hennen, ought to be deemed and held, and is hereby deemed and held, to have purchased the property in question, with full notice that the said sale at auction, under the pretended authority of the said Richard Relf and Beverly Chew, and their said act of sale to said Azelic Lavigne, were illegal, null, and void, and in fraud of the rights of the person or persons entitled to the succession of the said Daniel Clark.

And this court doth further order, adjudge, and decree, that all the property claimed and held by the defendant, Hennen, as aforesaid, now remains unclaimed and undisposed of as part and parcel of the succession of the said Daniel Clark, notwithstanding such sale at auction and act of sale in the pretended right or under the pretended authority of the said Richard Relf and Beverly Chew.

And the court doth further order, adjudge, and decree, that the complainant, Myra Clark Gaines, is the legitimate and

only child of the said Daniel Clark, and universal legatee under his last will and testament, is justly and lawfully entitled to the property aforesaid so claimed and held by the defendant, Hennen, together with all the yearly rents and profits accruing from the same since the same came into the said defendant's possession, to wit, on the 13th of May, 1844, and for which the said defendant is hereby adjudged, ordered, and decreed to account to the said Myra Clark Gaines.

And the court doth now here remand this cause to the said circuit court for such further proceedings as may be proper and necessary to carry into effect the following directions; that is to say:

1. To cause the said defendant, Hennen, forthwith to surrender all the property so claimed and held by him as aforesaid into the hands of the said Myra Clark Gaines, as a part of the succession of the said Daniel Clark.

2. To cause an account to be taken by the proper officers of the court, and under the authority and direction of the court, of the yearly rents and profits accrued and accruing from the said property since the 13th of May, 1844, when it came into the possession of the defendant, Hennen, and to cause the same to be accounted and paid to the said Myra Clark Gaines; the account to be taken subject to the laws of Louisiana in cases of such recovery as is now decreed in favor of the said complainant.

3. To give such directions and make such orders from time to time as may be proper and necessary for carrying into effect the foregoing directions, and for enforcing the due observance of the same by all parties and by the officers of the court.

Dissenting: Mr. Chief Justice TANEY, Mr. Justice CATRON, and Mr. Justice GRIER.

Mr. Justice CATRON dissenting.

A principal question in this case is, how far it is affected by the decree in the case of Gaines and wife *v.* Chew, Relf, and others, reported in 12 Howard.

In that case the complainant sought to recover: first, four

fifths of the real estate of Daniel Clark, alleged to be vested in the complainant, Mrs. Gaines, as heir of Daniel Clark; and, secondly, the undivided moiety of the real estate owned by Daniel Clark at his death, being the community interest taken by his widow, the mother of the complainant, Myra, from whom she obtained a conveyance for said moiety in 1844. In the former case this court found that Mrs. Gardette, the mother of Mrs. Gaines, was the wife of Jerome Des Grange, (in 1802 or 1803,) when the bill alleged she intermarried with Daniel Clark, and was. therefore, not the *widow* of Clark; and this moiety of the estate claimed by the bill was rejected.

2. It appeared in the former case, by the evidence furnished by the record in that suit, that Caroline Clark was the sister of Mrs. Gaines, born before the father and mother intermarried, as is alleged by the former bill; but she was fully recognised by the father as his illegitimate daughter, and was supported by him during his lifetime, and after his death by his friends. The deposition of Mr. Coxe proves these facts very fully.

Conceding the fact that the parents intermarried after Caroline's birth, then that marriage made Caroline a legitimate child of the marriage, and equal heir with Myra; such being the law of Louisiana. Nor could the father, by the laws of that State, take from his legitimate child more than one-fifth part of his estate by devise. Civil Code of 1808, ch. 3, sec. 1. And therefore Caroline and Myra each took as heir four-fifths of their father's estate, less the mother's moiety; that is, four shares each of twenty parts. On these portions the will of 1813 did not operate; the children holding the estate as heirs. It operated only on the two-twentieth parts which Daniel Clark had the power to devise by his will. Civil Code, 232, sec. 3; 234, sec. 4.

Caroline, who intermarried with Doctor Barnes, was a party respondent to the former suit, and answered the bill. She has since died beyond the jurisdiction of the court, and is not a party to this controversy; still, the interest of her absent heirs is entitled to protection. Nor can Mrs. Gaines set up any claim to that interest.

*Gaines v. Hennen.*

As respects the claim to one-tenth part, the next question is, whether the fact found in the former case, that the complainant was the daughter of Des Grange's wife, establishes the *status* of Mrs. Gaines, so that she is excluded from taking as devisee of Daniel Clark.

According to the provisions of the Code of 1808, this court held that Mrs. Gaines could not take as heir of her father; nor could she take her mother's grant by the deed of 1844.

By the laws of Louisiana, as they stood in 1813, the complainant was an adulterous bastard, and could not inherit from her father, (Code of 1808, p. 156, art. 46,) which declares, that "bastard, adulterous, or incestuous children, even duly acknowledged, shall not enjoy the right of inheriting their natural father or mother." And article 15, page 212, declares, that "natural fathers or mothers can in no case dispose of property in favor of their adulterine children, even acknowledged, unless to the mere amount of what is necessary to their sustenance, or to procure them an occupation or profession by which to support themselves."

The only issue decided in the former suit was, whether the complainant's mother for years before, and at the time of Myra's birth, was the lawful wife of Jerome Des Grange. The court so found, and based its decree dismissing the bill on that fact. *The fact* being established, carried with it all the legal consequences that result from the fact. 1st Stark. Ev., 182, sec. 57. One of these consequences is, that Mrs. Gaines was an adulterous bastard, according to the laws of Louisiana, and incapable of taking by the will of her father.

But suppose this consequence does not follow; then how does the matter of estoppel stand? The complainant, Mrs. Gaines, by her amended bill, filed in 1848, renounced all claim that she had to the property sued for by her original bill, (including the same sued for now,) as instituted heir of Daniel Clark, by the will of 1813, and asserted a right to four-fifths of said property as legal or forced heir and only legitimate child of Daniel Clark, and declared she would *not* rely on said will of 1813. O. R., p. 85.

She also virtually renounced as heir one moiety of the estate

Daniel Clark died possessed of, and set up a deed from her mother for the moiety as lawful widow of said Clark; this being her community interest by the laws of Louisiana. Old R., p. 32.

That the widow was entitled to a moiety as her share in the community is alleged and relied on by the foregoing amendment; and the complainant being the party who made the avowal, is irrevocably bound by it. Such is the statute law of Louisiana, declared by the Code of 1808, (p. 314,) and the Code of 1825, (vol. 2, p. 355.)

In the former case the avowal was matter of title, and in this case it is conclusive evidence of the fact avowed as against the complainant. The law of Louisiana binds the Federal courts in like manner that it is binding on the State courts. So this court has uniformly held. 1 St. at Large, 92; note (a) to 34th sec. of Judiciary act of 1789.

If the mother was lawful widow of Clark, then her right to the moiety was undoubted, as the parties resided in Louisiana, and it is alleged the property was acquired during the coverture. Mrs. Gaines must abide by her allegations in the former suit, as on them the issues were formed, and on which the decree in that suit proceeded.

Nine of ten parts of Clark's estate was sued for by the former bill. The decree rejected on a direct issue five-ninths claimed to have been acquired by deed from said mother, on the ground that she was the wife of Des Grange, when, as is alleged, she intermarried with Clark, and when the complainant was born. This was the precise issue made, and found by the court, and is undoubtedly *res judicata* as respects the mother's moiety. As to the other five-tenths, Mrs. Gaines, by her amended bill of 1848, in express terms renounced one-fifth to the purchasers, under Daniel Clark's will of 1811. To the extent of one-fifth, the validity of that will was recognised. The complainant cannot be allowed to split up her claim and sue for portions by several suits.

The remaining four-fifths of the moiety Mrs. Gaines claimed to recover as legal or forced heir. Heir, or no heir, was the issue tried. This court found that she was Clark's daughter

by Des Grange's wife, and not Clark's lawful heir, and there-fore dismissed her bill. It follows, that as to the four-fifths of one-half, the complainant stands barred as heir by the de-cree.. She is also estopped by the former proceedings to suo a second time for the moiety derived from her mother; and thirdly, is estopped to set up a claim to the one-tenth part she renounced and abandoned.

An objection is raised that the parties in this cause are not the same who were sued in the former case. The bill alleges that they are the same; and so they are, except that Mr. Hen-nen claims under the railroad company by a conveyance of the land in dispute, made pending the former suit, which, if it had been decided against the railroad company, would have bound Hennen, and being decided in favor of the company, bound the complainant.

The rule in chancery proceedings is, that where there are contesting parties in each suit, as between these parties, a de-cree is *res judicata*. It was so held by this court at the present term in the case of Thompson and als. *v.* Roberts and als. Sixty defendants were sued by the former bill; they all, as joint respondents, got a decree against the complainant on her common title set up against them all. The estoppel operated against her for each defendant; and in this second contestation of the same title any one respondent to the former suit can set up the estoppel in his favor.

The laws of Louisiana are confidently relied on as prescrib-ing the true rule of estoppel. In this English bill in equity, resorted to here, as a remedy, the rule is, that the same sub-ject-matter cannot be litigated twice between the same parties on evidence brought forward or left out of the first case. Here the will of 1813 is introduced, and could just as well have been introduced in the former suit. The difficulty was, that it had not been proved and recorded in the probate court. But it might have been proved just as well forty years before the time it was admitted of record as now. If a title deed could not be read on the hearing for want of being recorded, the complainant might fail to recover. This is of constant occur-

rence; still, the judgment or decree would be as conclusive as if the deed had been authenticated and recorded. It was simply a neglect of the complainant to produce her proof in legal form; a matter with which the defendants had no concern. Holding back an existing will and making an experiment on the issue of heirship, requiring the same proof, and, in case of failure, to bring a second suit on the established will, is a mere contrivance, and an evasion of the due administration of justice, which cannot be allowed. On the will of 1813 the present bill is founded. By that *will* Daniel Clark declares the complainant, Myra, to be his only legitimate and lawful heir, and devises to her all his estate. She must, therefore, have been his daughter, born in wedlock. Conceding this to be true, and it follows as a consequence that the complainant took as heir, and not as devisee, to the extent of four-fifths. As to four-fifths of a moiety, we are by this bill called on to try the precise issue of heir, or no heir, that we tried in the former suit.

If the decision reported in 12 How. be overthrown, ruin must be the consequence to very many who have confided in its soundness. In a rapidly-growing city like New Orleans, much of the property supposed to be protected by our former decree must have changed hands. Large improvements must have been made in the nine years since that suit was decided. It covered all Daniel Clark's estate as it existed at his death, and had over sixty defendants to it. If the twenty odd defendants to this bill can be recovered against, so can the others who were parties to the first suit.

It is most manifest from this record that the fragment of a cause brought here by Mrs. Gaines and Mr. Hennen by stipulation will, in effect, decide, *and was intended to decide*, the cause of the other defendants sued jointly with Mr. Hennen, and who are standing helpless, awaiting their fate at the hands of this court.

It is insisted by counsel that Clark, being a *free man*, could lawfully devise to his daughter; and that the laws of Louisiana did not apply to the case of a single and free man be-

queathing to his child by a married woman, as was done here. Such a construction would evade the code to a great extent. Its terms are too plain for controversy, and so the courts of Louisiana have held. Jung *v.* Dorescourt, 4 L., 178.

According to this assumption, slaves might be devisees, if the evasion was used to suppress the fact that the mother was a slave. As in case of other conveyances, wills must have a grantee capable to take by the devise; and it is undoubtedly true that the heir-at-law, or a devisee, holding under a former will, can plead and prove the facts of incapacity by parol evidence, and thereby defeat the last will, and of course alienees, in the condition these respondents are, can do the same. The case above cited (4 L., 178) is directly to this point, and to the same effect it was held in Robinett *v.* Verdum, (14 L., 542.) There, the court declared that a disguised donation to a slave child under the forms of a sale was absolutely null.

But the right and justice of this cause depends on the defence of the plea of *bona fide* purchaser set up by the answer. The bill in chancery is a remedy peculiar in its character, when resorted to in the Federal court held in the State of Louisiana. In the State courts there, this defence is unknown. But when a complainant resorts to it to enforce rights to lands in the Federal court, the respondent can defend himself, as an innocent purchaser, if he pleads, and can show that he acquired by purchase at a fair price, and got an apparent legal title, without notice of an outstanding better title, the purchaser believing that he acquired full property in the land; and the question is, has the respondent here made out such a defence? The purchase was made from Mary Clark, in 1820, by her legally-constituted attorneys in fact, Chew & Relf. She claimed to be the true owner by a will made in her favor as instituted heir. It is an olographic will, in due form, fully proved, and regularly recorded. This will, from the time it was probated in 1813, stood as the true succession of Daniel Clark for more than forty years. An immense estate in lands and personal property has been acquired under it, by all classes of innocent purchasers, without any suspicion of the fact that any other and better title existed. It is admitted on behalf of the re-

spondents, by stipulation in this cause, that each purchaser who bought in 1820, and every subsequent purchaser under the first one, bought for a full price, paid the purchase money, and got a regular conveyance for the land purchased. This title, tested by itself, was a perfectly fair legal title, according to the laws of Louisiana. Duplesse *v.* White, 6 A., 514. If Mary Clark sold the estate without an authorization from the court of probate, by that act she rendered herself liable to pay the testator's debts; but this did not affect the purchaser. He was not bound to know that any debts existed, nor to see to the application of the purchase-money. The present bill does not allege that there were any debts owing by Daniel Clark at the time of his death; on the contrary, the complainant sues for the lands, and the rents and profits of them, without any reductions. Finding Daniel Clark's estate to be insolvent on the accounts exhibited, General and Mrs. Gaines, by their amendment of 1844, declare that they do not require of said Chew & Relf any account, and that they "discontinue their prayer to that end."

The complainant admits the existence and probate of the will of 1811; but denies in general terms that the sales were lawfully made. For more than forty years the respondents and their alienors had a regular legal title, traceable to the only then existing succession of Daniel Clark; they could sue for and recover the land by force of that title. They knew nothing of the existence of Myra. She was born in New Orleans in 1804 or 1805, and immediately after her birth was taken from her mother by Daniel Clark, her reputed father, and put into the charge of Colonel and Mrs. Davis. In her childhood she was carried to the State of Pennsylvania, raised up and resided there till 1832, when she intermarried with William W. Whitney, under the name of Myra Davis; during all which time she was ignorant of her true name, history, and rights. She so states in her first bill, filed in 1836, put in evidence in this suit. Of course the purchasers of the lands sued for could have no knowledge of the complainant's existence when they paid their money and took title, in 1820.

But the respondents would have been *bona fide* purchasers

*Gaines v. Hennen.*

had the will of 1811 never existed. Mary Clark was the apparent legal heir of her son in the ascending line. Daniel Clark was known and recognised in New Orleans as an unmarried man; he had resided there from his youth, and was extensively and uncommonly well known, having represented the Territory of Orleans in Congress. A number of witnesses prove, and most conclusively, that he was deemed and recognised universally as a man who had never been married up to the time of his death. His father was then dead, and Mary Clark, his mother, recognised as his undoubted heir. He addressed and made propositions of marriage to ladies of his own rank, after it is pretended he had married Madame Des Grange. Those who purchased in 1820, including judges of the highest rank residing on the spot, could not doubt the validity of Mary Clark's title, and power to sell the lands they bought and paid for.

In the printed argument submitted to us on behalf of the complainant, and again on the oral argument delivered before us in this court, the answer to this apparently complete defence was, that Mary Clark was dead in 1820, when her attorneys made the sales, and conveyed in her name.

The bill alleges no such fact, nor does the answer refer to it. But the complainant, by her bill of 1848, in evidence here, states that Mary Clark died in June or July, 1823, leaving a will, alleging who the legatees were, (of which the complainant was one;) and some of these legatees are made defendants to that bill. Daniel W. Coxe proves the circumstances connected with making the will of Mary Clark, and says she died in 1823, in which year her will was duly proved and recorded in Philadelphia county, Pennsylvania.

It is also relied on that Mary Clark did not accept the succession by taking possession of the estate in legal form. She made her power to sell, and did sell, and gave possession to the purchasers, and they have held actual adverse possession under their conveyances since 1820. This is admitted of record; and it is now too late, after the lapse of thirty-five years before they were sued, to set up this technical objection. The

presumption in favor of regularity in the proceeding is too clear to admit of controversy.

Another objection is made to this plea of *bona fide* purchaser, namely, that Chew & Relf had no authority from the probate court to sell, and that they joined with Mary Clark in the conveyance. The conveyance of Mary Clark was valid, notwithstanding this circumstance, as the Supreme Court of Louisiana held in Duplesse *v.* White, 6 A., 514. She held the actual legal title. The will operated as a conveyance in the same manner that a private act of sale would have done. It is proved that the sales of the estate were made at auction, and had the form of sales made by authorization of the court; this is the fair presumption; nor can the complainant at this late day have a decree against these respondents. Presumption that the executors were duly authorized to make sales for payment of debts comes instead of proof. This bill was filed more than thirty years after Mrs. Gaines became of age, and thirty-six years after the first vendor purchased and took title, in 1820; and it must be presumed that the proper orders of the probate court were granted. The presumption arises from possession and lapse of time. Possession of itself is, in the nature of men and things, an *indiceum* of ownership. If all persons acquiesce in the possession, the acquiescence tends to prove property in the possessor; and after the lapse of thirty years the probabilities so increase, that courts of justice, for the safety of society, hold an adverse claim to be without foundation. He who thirty years ago may have been abundantly able to show regularity of proceedings and evidence of ownership, may be unable to do so now. His witnesses may be dead, as is emphatically the case here. His title-papers may be destroyed or lost; and a court of equity must say, as the Supreme Court of New York did in the case of McDonald *v.* McNeal, (10 Johns. R., 380,) "The fact is presumed for the purpose and from a principle of quieting men's possessions, and not because the court really think a grant has been made." Or, as the Supreme Court of Tennessee said in the case of Hanes *v.* Peck, (Martin & Yerger's R., 236,) "In such case,

length of possession supplies the place of testimony; presumption is substituted for belief; we believe when the fact is proved; we presume in the absence of proof."

Had Mary Clark's devisees sued this purchaser, he could have relied on presumption to supply proof of regular orders from the probate court to authorize the executors to sell, or that Mary Clark regularly accepted the succession; and the same presumption must prevail against this complainant.

It is provided by the 7th section of the act of March 25, 1810, that contracts of sale of real property in Louisiana shall be recorded in the office of the parish judge where the property is situated; and if not so recorded, the contract shall be void. It is admitted in this case that both the power of attorney from Mary Clark and the deeds to purchasers made under that power were not recorded in the office of the probate judge, but that they were recorded in a notary's office in New Orleans; and it is assumed, and the cause is made to depend mainly on the fact, that the sales of Chew & Relf, as attorneys of Mary Clark, are null as to third persons for this reason. This is an entire mistake. The act of 1810, section 7, never had any application to the parish of Orleans, where the land in dispute lies. It "had reference to those parishes where the office of parish judge was established, combining with the judicial powers of the officer those of notary and recorder of mortgages," &c. "These powers were not possessed by the judge of the parish and city of New Orleans. The law is not applicable to this parish, and has been so considered ever since its enactment." Morris *v.* Crocker, 4 Louis'a, p. 149. It is further held, that the notarial offices of the city were the proper offices in which the record was to be made. Id. In this, and all other respects, Mary Clark's conveyance was regular.

The evidence shows, that as against the respondents to this bill, the claim set up is grossly unjust. Clark's failure was very large; his estate was wholly insolvent. The purchasers have in fact paid his debts to a large amount. Many of them are yet unpaid. The purchasers have built houses and raised families on the property now sought to be recovered. A city

has been built upon it. It has probably increased in value five hundred fold since 1820; much of it certainly has.

That the respondents have been harassed with a previous lawsuit for the same property, in which the complainant claimed as heir, and was defeated, neither helps her case nor lessens the hardships imposed on the respondents.

At the argument, conclusions of law and of fact were relied on as having been established by the case of Patterson *v.* Gaines and wife, reported in 6 How. R. That was a false and fictitious case made up by Gaines and wife, with the assent of Patterson, they having relinquished to him the property sued for. The object of that suit was to circumvent this court by a fraudulent contrivance to obtain an opinion here, to the end of governing the rights of the other defendants sued jointly with Patterson. And in this, General and Mrs Gaines seemingly succeeded. They obtained both the opinion and decree they sought; but when the other defendants came to a hearing they examined Patterson as a witness, and proved and exposed by his testimony the contrivance and fraud practised; and for us now to declare that so gross a contempt to this court, and the practice of a fraud so disgraceful to the administration of justice, established any matter of fact or any binding principle of law, would be to sanction and uphold that proceeding, and to invite its repetition. That case should be disregarded, as it was disregarded, when the cause of which it was part was fully and fairly heard in 1852, and which is reported in Howard's Reps., vol. 12.

The case of Lord *v.* Veazie, (8 How., 253,) is full to the point, that a fictitious proceeding is void because there is no contest. Patterson did not act in the matter at all, further than to lend his name to General and Mrs. Gaines. They made up the case by filing the answer to their own bill—filing such evidence as suited their purposes; and bringing up the appeal to this court in Patterson's name.

By an amendment to their bill made in 1849, (12 Howard, 537,) General and Mrs. Gaines had the boldness to allege and claim that the decree in Patterson's fictitious case was *res ju*

*dicata*, and an estoppel to the other defendants to that suit; and to that end relied on the decree on the final hearing in 1852, thereby avowing the fraudulent object of obtaining that decree.

A question not directly decided in the case reported in 12 How. was, whether Daniel Clark married Mrs. Des Grange. Madame Despau swore that she was present at the marriage in Philadelphia, and that several others were present. Her integrity and credit as a witness were so directly overthrown in the former case by the deposition of Daniel W. Coxe, and by many circumstances, as to leave her evidence of no value. She swore that she went to Philadelphia with her sister to procure evidence of Des Grange's marriage previous to marrying her sister. Coxe proved beyond doubt that the two women came there for the sole purpose of concealing the birth of a child, of which Mrs. Des Grange was pregnant, and of which she was very soon delivered, and it was secreted and raised to womanhood near Philadelphia. This was Caroline, afterwards Mrs. Barnes. And so soon as Mrs. Des Grange was able to travel, the two women returned to New Orleans. Me. Despau also swore in several depositions that this was Des Grange's child. At the time of its birth he had been absent in France for more than a year. Clark sent Mrs. Des Grange to Mr. Coxe with a letter, saying the child was Clark's, and to provide for the mother, and take charge of the child, which Coxe did. It was suggested at the argument that Coxe was not a competent witness, and not altogether entitled to credit. Clark's estate owed Coxe largely, and if Mrs. Gaines recovered, then Coxe expected to be benefited by the recovery. So that he was interested to uphold Mrs. Gaines's claim; nor has the deposition of Mr. Coxe been objected to; on the contrary, it is admitted by stipulation. R., 93.

Mr. Coxe's character for integrity is prominently manifest by sustaining facts.

Clark never admitted the marriage to any one entitled to credit, or who could be believed, when swearing to what a dead man had said.

He proposed to marry another lady in 1808, and Mrs. Des

Grange and Madame Despau came to Philadelphia, and sent for Mr. Coxe, then in partnership with Mr. Clark in large mercantile transactions, and inquired of him whether the fact was true. Coxe assented. Mrs. Des Grange said that Clark had *promised* to marry her, and that she then felt at liberty to marry herself; and soon after, she was married to M. Gardette, a dentist of Philadelphia.

In 1805 Des Grange returned to New Orleans, and was sued by his wife for alimony. She recovered, and had a decree against him for five hundred dollars per annum. Mrs. Des Grange never assumed that Clark was her husband, so far as we are informed from any reliable source. She resided in Louisiana for many years, and until these proceedings had progressed for fifteen years and more, and could have deposed to the fact of marriage had her daughter seen proper to examine her as a witness; but this was not done.

It is altogether immaterial, however, whether Clark did or did not marry Des Grange's wife, as it could be of no value to the complainant if he did. Clark must have been an innocent and deluded party to give Mrs. Gaines the benefit proposed by the will of 1813—as in case of an adventurer, from abroad, marrying an innocent single woman, leaving a wife behind him. There, the children of the second marriage cannot be disinherited and condemned; they can take as bastards, from the mother. So the courts of Louisiana hold. But what are the facts here? Clark acted in concert with Mrs. Des Grange and her sisters in sending Des Grange to France, as agent of his wife's family, to settle up the affairs of an estate of theirs at Bordeaux. Des Grange was absent about fifteen months, and in the mean time, and shortly before the expiration of the time, Mrs. Des Grange was delivered of the child Caroline at Philadelphia, which Clark admitted at all times before his death was his child. This is an undisputed fact. Clark acted as the friend of Des Grange, and corresponded with him during his absence, and aided his wife. The criminal connection that was exposed by the birth of the child had obviously existed before Des Grange was sent to France; and in the transaction of sending him away, and of prosecuting

him on his return, Mrs. Des Grange, her two sisters, and Clark, were undoubtedly acting in conjunction. Madame Caillivet swears that she set on foot the prosecution against Des Grange. 12 How., 509, 510.

That Des Grange had a wife living when he married the complainant's mother was a mere pretence to cover a nefarious transaction, as is abundantly established by the facts appearing in the case reported in 12 Howard. The idea, therefore, that Clark was an innocent and deluded party, is wholly inadmissible, and must be rejected as the least sustained part of this remarkable case.

I am of the opinion that the decree of the Circuit Court should be affirmed.

Mr. Justice GRIER dissenting.

I wholly dissent from the opinion of the majority of the court in this case, both as to the law and the facts. But I do not think it necessary to vindicate my opinion by again presenting to the public view a history of the scandalous gossip which has been buried under the dust of half a century, and which a proper feeling of delicacy should have suffered to remain so; I therefore dismiss the case, as I hope, for the last time, with the single remark, that if it be the law of Louisiana that a will can be established by the dim recollections, imaginations, or inventions of anile gossips, after forty-five years, to disturb the titles and possessions of *bona fide* purchasers, without notice, of an apparently indefeasible legal title, "*Haud equidem invideo, miror magis.*"